# EXHIBIT 1

IL P 001 01 04

# U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC")
# ADVISORY NOTICE TO POLICYHOLDERS

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Notice provides information concerning possible impact on your insurance coverage due to directives issued by OFAC. **Please read this Notice carefully.**

The Office of Foreign Assets Control (OFAC) administers and enforces sanctions policy, based on Presidential declarations of "national emergency". OFAC has identified and listed numerous:

- Foreign agents;
- Front organizations;
- Terrorists;
- Terrorist organizations; and
- Narcotics traffickers;

as "Specially Designated Nationals and Blocked Persons". This list can be located on the United States Treasury's web site – http//www.treas.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, no payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments also apply.

©ISO Properties, Inc., 2004

# SITE SPECIFIC POLLUTION LEGAL LIABILITY POLICY DECLARATIONS

Renewal of Number

ENVP012929-01

**Policy No.**

ENVP012929-02

INSURANCE IS PROVIDED BY

## ROCKHILL INSURANCE COMPANY
**KANSAS CITY, MISSOURI**

Named Insured and Mailing Address

Southeastern Cheese Corp.

PO BOX 535
Uniontown, AL 36786

92 Washington Street
Uniontown, AL 36786

Agent

Environmental Underwriting Solutions
3800 Colonnade Parkway
Suite 655
Birmingham, AL 35243

| Form of Business: | Corporation - private |
|---|---|

Policy Period:  From  04/23/2017   To   04/23/2018    12:01 A.M. Standard Time at your
Mailing address shown above.
(Unless otherwise Endorsed)

Limits of Insurance:

| | |
|---|---|
| Aggregate Limit: | $ 1,000,000 |
| Each Pollution Condition Limit: | $ 1,000,000 |

| | | |
|---|---|---|
| Deductible Amount: | $ 5,000.00 | Each Pollution Condition |

| Scheduled Location(s): | Retroactive Date(s): |
|---|---|
| See RHIC 6810, Scheduled Locations Endorsement attached | See RHIC 6810, Scheduled Locations Endorsement Attached |

IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL OF THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE STATED IN THIS POLICY.

ONLY THOSE INSURING AGREEMENTS FOR WHICH A PREMIUM IS INDICATED ARE PROVIDED BY THIS POLICY.  THIS PREMIUM MAY BE SUBJECT TO ADJUSTMENT.

| INSURING AGREEMENT | PREMIUM |
|---|---|
| Coverage A - Pollution Legal Liability        (   25 % Minimum Earned Premium) | |
| Coverage B - On-Site Clean-Up Costs | |
| Terrorism (if purchased is 100% Minimum Earned) | |
| | Minimum Earned Premium |
| | TOTAL MINIMUM & DEPOSIT PREMIUM |

Premium shown is payable: at inception

Form(s) and Endorsement(s) that are made a part of this policy at time of issue and that add, change, exclude or limit coverage*:  See RHIC 6046, Schedule of Forms and Endorsements attached.

*Omits applicable Forms and Endorsements if shown in specific Coverage Part/Coverage Form Declarations.

Date of Issue: 04/20/2017

Countersigned By _____
AUTHORIZED REPRESENTATIVE

THESE DECLARATIONS TOGETHER WITH THE COMMON POLICY CONDITIONS, COVERAGE PART DECLARATIONS, COVERAGE PART COVERAGE FORM(S) AND FORMS AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF, COMPLETE THE ABOVE NUMBERED POLICY.

## SCHEDULE OF FORMS AND ENDORSEMENTS

| NAMED INSURED:<br>Southeastern Cheese Corp. | DECLARATIONS<br>EFFECTIVE DATE:<br><br>04/23/2017 | POLICY NUMBER:<br><br>ENVP012929-02 |
|---|---|---|

IF THIS ENDORSEMENT IS LISTED IN THE POLICY DECLARATIONS, IT IS IN EFFECT FROM THE TIME COVERAGE UNDER THIS POLICY COMMENCES, OTHERWISE, THE EFFECTIVE DATE OF THIS ENDORSEMENT IS AS SHOWN ABOVE AT THE SAME TIME OR HOUR OF THE DAY AS THE POLICY BECAME EFFECTIVE.

THIS ENDORSEMENT IS USED AS AN OVERFLOW FOR FIELDS ON THE DECLARATIONS PAGE NOT LARGE ENOUGH FOR THE NECESSARY INFORMATION.

**Site Specific Legal Liability**

| | |
|---|---|
| IL P 001 01/04 | Advisory Notice to Policyholders |
| RHIC 6800 09/08 | SSP Legal Declarations |
| RHIC 6046 05/12 | Schedule of Forms and Endorsements |
| RHIC 6801 09/08 | SSP Legal Coverage Form |
| IL 09 85 01/15 | Disclosure Pursuant to Terrorism Risk Insurance Act |
| RHIC 6516 04/15 | Cap on Losses from Certified Acts of Terrorism |
| RHIC 6810 09/08 | Scheduled Locations Endorsement |
| RHIC 6028 01/08 | Service of Suit |
| RHIC 1101 01/16 | Signature Endorsement |
| RHIC 6051 09/08 | Nuclear Energy Liability Exclusion Endorsement |
| RHIC 6504 04/15 | Exclusion of Punitive Damages Related to a Certified Act of Terrorism |
| RHIC 1112 01/09 | Cancellation / Non-Renewal |

# SITE-SPECIFIC POLLUTION LEGAL LIABILITY POLICY

THIS COVERAGE FORM PROVIDES CLAIMS-MADE COVERAGE.
CLAIMS EXPENSES ARE INCLUDED WITHIN THE DEDUCTIBLE AMOUNT AND THE
LIMITS OF INSURANCE WILL BE REDUCED BY LEGAL EXPENSES.
PLEASE READ THE ENTIRE FORM CAREFULLY.

Various provisions in this policy restrict coverage.  This is limited insurance.  It does not provide Commercial General Liability Coverage.  Read the entire policy carefully to determine rights, duties, and what is and is not covered.

Capitalized words have a special meaning as used in this policy.  Please read the definitions section for their complete meaning.  The words "our" and "Company" refer to the Company providing this Policy of insurance.

I.   INSURING AGREEMENTS

THE COVERAGES BELOW ARE ONLY IN EFFECT IF SUCH COVERAGE IS SCHEDULED ON THE DECLARATIONS OF THIS POLICY.

In consideration of the payment of the Policy Premium, in reliance upon the statements contained in the Application and any other supplemental materials and information submitted herewith, and subject to all the terms and conditions of this Policy, the Company agrees with the INSURED as follows:

A.  COVERAGE A – POLLUTION LEGAL LIABILITY

1.  The Company will pay on behalf of the INSURED, LOSS and related LEGAL EXPENSE directly resulting from a POLLUTION CONDITION at, on, under or migrating from any SCHEDULED LOCATION and which first commenced on or after the RETROACTIVE DATE, if any; and

Which the INSURED is legally obligated to pay as a result of a CLAIM first made against the INSURED during the POLICY PERIOD, and the INSURED gives written notice of the CLAIM to the Company during the POLICY PERIOD or the EXTENDED REPORTING PERIOD, if applicable; and

2.  The Company will pay on behalf of the INSURED, CLEAN-UP COSTS beyond the legal boundary of any SCHEDULED LOCATION and related LEGAL EXPENSE resulting from a POLLUTION CONDITION migrating from any SCHEDULED LOCATION which first commenced on or after the RETROACTIVE DATE, if any

And which is:

a.  First discovered and reported in writing to the Company during the POLICY PERIOD, or the EXTENDED REPORTING PERIOD if applicable; or

b.  For a CLAIM first made against the INSURED during the POLICY PERIOD which the INSURED is legally obligated to pay and the INSURED gives written notice of the CLAIM to the Company, during the POLICY PERIOD or the EXTENDED REPORTING PERIOD if applicable.

B.  COVERAGE B – ON-SITE CLEAN-UP COSTS

The Company will pay on behalf of the INSURED, CLEAN-UP COSTS at, on, or under any SCHEDULED LOCATION and related LEGAL EXPENSE resulting from a POLLUTION CONDITION at, on, or under any SCHEDULED LOCATION and which first commenced on or after the RETROACTIVE DATE, if any, which is:

1.  First discovered and reported in writing to the Company during the POLICY PERIOD, or the EXTENDED REPORTING PERIOD if applicable; or

2.  For a CLAIM first made against the INSURED during the POLICY PERIOD which the INSURED is legally obligated to pay and the INSURED gives written notice of the CLAIM to the Company, during the POLICY PERIOD or the EXTENDED REPORTING PERIOD if applicable.

II. DEFINITIONS

A. ADDITIONAL NAMED INSURED means any person(s) or entity(ies) specifically endorsed onto this Policy as an ADDITIONAL NAMED INSURED, but solely to the extent such person(s) or entity(ies) is/are vicariously liable as a result of the INSURED'S ownership, occupation, operation, maintenance, or use of any SCHEDULED LOCATION.

Notwithstanding the above, no coverage shall be afforded to an ADDITIONAL NAMED INSURED for CLEAN-UP COSTS, LOSS, or LEGAL EXPENSES resulting from a POLLUTION CONDITION or material circumstance known by a RESPONSIBLE INSURED prior to the date that such ADDITIONAL NAMED INSURED is endorsed to the Policy when such POLLUTION CONDITION or material circumstance is either:

1. otherwise excluded by the terms or endorsements of this Policy; or

2. not disclosed to the Company, provided that any RESPONSIBLE INSURED knew or reasonably could have expected that such POLLUTION CONDITION or material circumstances could give rise to CLEAN-UP COSTS, CLAIM or LOSS under this Policy.

B. AUTO means any land motor vehicle, trailer or semi-trailer designed for travel on public roads, including any attached machinery or equipment or any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged.

C. BODILY INJURY means physical injury, sickness, disease, mental anguish, emotional distress, or shock sustained by a person, including death resulting from a POLLUTION CONDITION.

D. CLAIM means a written demand(s), notice(s) or assertion(s) of a legal right alleging liability or responsibility on the part of the INSURED seeking a remedy and shall include but not be limited to lawsuit(s), petition(s), order(s) or government and/or regulatory action(s), filed against the INSURED by a third party.

E. CLEAN-UP COSTS means necessary and reasonable expenses incurred as a result of a POLLUTION CONDITION to investigate, assess, remove, dispose of, abate, contain, treat, immobilize or neutralize a POLLUTION CONDITION, to the extent required by:

1. Federal, State, Local or Provincial Laws, Regulations or Statutes, or any subsequent amendments thereof, enacted to address a POLLUTION CONDITION, including any individual or entity acting under the authority thereof; or

2. A legally applicable state voluntary program governing the cleanup of a POLLUTION CONDITION.

CLEAN-UP COSTS shall also include any associated monitoring, testing costs, and RESTORATION COSTS.

F. EXTENDED REPORTING PERIOD means the Automatic Extended Reporting Period or, if applicable, the Optional Extended Reporting Period, as described in Section V. EXTENDED REPORTING PERIOD of this Policy.

G. FIRST NAMED INSURED means the person or entity stated as such in the Declarations.

H. INSURED means the FIRST NAMED INSURED, any ADDITIONAL NAMED INSURED endorsed onto this Policy, and any present or former director, officer, partner, employee, leased worker or temporary worker thereof while acting within the course and scope of his/her duties as such.

I. LEGAL EXPENSE(S) means any legal costs, charges and expenses incurred in the investigation, adjustment or defense of any CLAIM for LOSS or CLEAN-UP COSTS, or in connection with the payment of any CLEAN-UP COSTS as applicable, and shall include any necessary expert fees paid to experts retained by defense counsel.

LEGAL EXPENSE does not include the time and expense incurred by the INSURED in assisting in the investigation or resolution of a CLAIM or in connection with CLEAN-UP COSTS, including but not limited to the costs of the INSURED'S in-house counsel, salary charges of regular employees or officials of the INSURED, and fees and expenses of supervisory counsel retained by the INSURED.

J. LOSS means monetary judgment, award or settlement of compensatory damages arising out of BODILY INJURY or PROPERTY DAMAGE as a direct result of a POLLUTION CONDITION, as well as related punitive, exemplary or multiplied damages where insurance coverage is allowable by law.

K.  MOLD MATERIAL means mold, mildew or any type or form of fungus or other microbial material; including any associated mycotoxins, spores, or byproducts, whether living or not.

L.  NATURAL RESOURCE DAMAGE means physical injury to or destruction of, as well as the assessment of such injury or destruction, including the resulting loss of value of land, fish, wildlife, biota, air, water, groundwater, drinking water supplies, and other such resources belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by the United States (including the resources of the fishery conservation zone established by the Magnuson-Stevens Fishery Conservation and Management Act (16 U.S.C. 1801 et. seq.)), any State, Local or Provincial government, any foreign government, any Native American tribe or, if such resources are subject to a trust restriction on alienation, any member of a Native American tribe.

M.  POLICY PERIOD means the period stated as such in the Declarations, or any shorter period arising as a result of cancellation or other termination.

N.  POLLUTANTS means any solid, liquid, gaseous or thermal pollutant, irritant or contaminant including but not limited to smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, hazardous substances, waste materials, including medical, infectious and pathological wastes, and electromagnetic fields provided that such POLLUTANTS are not naturally present in the environment in the amounts or concentrations discovered. POLLUTANTS shall not include MOLD MATERIAL.

O.  POLLUTION CONDITION means the discharge, dispersal, release, seepage, migration, or escape of POLLUTANTS into or upon land, or structures thereupon, the atmosphere, or any watercourse or body of water including groundwater.

P.  PROPERTY DAMAGE means:

1.  Physical injury to or destruction of tangible property, including the resulting loss of use thereof, and including the personal property of third parties;

2.  Loss of use of such property that has not been physically injured or destroyed;

3.  Diminished third party property value; or

4.  NATURAL RESOURCE DAMAGE, caused by any POLLUTION CONDITION.

PROPERTY DAMAGE does not include CLEAN-UP COSTS.

Q.  RESPONSIBLE INSURED means:

1.  Any officer, director, or partner of the INSURED;

2.  Any person(s) or entity(ies) authorized by the INSURED to act for or in place of The INSURED; or

3.  Any employee of the INSURED responsible for the environmental or health and safety affairs of the INSURED.

R.  RESTORATION COSTS means reasonable and necessary costs incurred by the INSURED to restore, repair or replace real or personal property to substantially the same condition it was in prior to being damaged during work performed in the course of incurring CLEAN-UP COSTS.

However, these costs shall not exceed the actual cash value of such real or personal property immediately prior to incurring the CLEAN-UP COSTS or include costs associated with improvements or betterments. Actual cash value is defined as the cost to replace such real or personal property, immediately prior to incurring the CLEAN-UP COSTS, minus the accumulated depreciation of the real or personal property.

S.  RETROACTIVE DATE means the date specifically listed in the Declarations or any endorsement(s) attached to this policy as being applicable to a SCHEDULED LOCATION or SCHEDULED NON-OWNED LOCATION (if such coverage is added to the Policy by endorsement).

T.  SCHEDULED LOCATION means any location(s) listed as a SCHEDULED LOCATION in the Declarations or any endorsement(s) attached to the policy.

U.  UNDERGROUND STORAGE TANK(S) means any stationary container or vessel under a SCHEDULED LOCATION, including the associated piping connected thereto, which is ten percent (10%) or more beneath the surface of the ground and is: (i) constructed primarily of non-earthen materials; and (ii) designed to contain any substance.

## III.  TERRITORY

A CLAIM must be made or brought in the United States, its territories or possessions, or in Canada. This Policy shall not apply to any risk which would be in violation of the laws of the United States or Canada, as applicable, including, but not limited to, United States economic or trade sanction laws or export control laws administered by the United States Treasury, State, and Commerce Departments (e.g. the economic and trade sanctions administered by the United States Treasury Office of Foreign Assets Control).

## IV.  EXCLUSIONS

This insurance Policy does not apply to:

A.  Non-Disclosed Conditions

CLEAN-UP COSTS, CLAIMS, or LEGAL EXPENSE arising from any POLLUTION CONDITION or any other material circumstances existing prior to the inception date of this Policy, or prior to such subsequent time that a Scheduled Location is endorsed to this Policy, and not disclosed in the application for this Policy, provided that any RESPONSIBLE INSURED knew or reasonably could have expected that such POLLUTION CONDITION or material circumstances could give rise to CLEAN-UP COSTS, CLAIM or LOSS under this Policy.

Subject to all other terms, conditions, exclusions, and RETROACTIVE DATE(S), if any, of this policy, any POLLUTION CONDITION disclosed by the INSURED in writing to the Company and not otherwise excluded under this Policy or by endorsement is deemed to be first discovered on the date a SCHEDULED LOCATION is endorsed to this Policy.

B.  Fines/Penalties/Assessments

CLAIMS or LEGAL EXPENSE based upon or arising out of any fines, penalties or assessments. This exclusion does not apply to punitive, exemplary or multiplied damages where allowable by law.

C.  Employer's Liability/Workers' Compensation

CLAIMS or LEGAL EXPENSE based upon or arising out of BODILY INJURY to:

1.  Any employee, director, officer, partner, leased worker or temporary worker of the INSURED, its parent company or subsidiary, if such injury occurs during and in the course of said employment, or during the performance of duties related to the conduct of or in furtherance of the INSURED'S business, or arising out of any Workers' Compensation, unemployment compensation or disability benefits law or similar law; or

2.  The spouse, child, parent, brother or sister of such employee, director, officer, partner, leased worker or temporary worker of the INSURED as a consequence of Item 1. above.

D.  Contractual Liability

CLEAN-UP COSTS, CLAIMS, or LEGAL EXPENSE based upon or arising as a result of liability of others assumed by the INSURED in any contract or agreement.

This exclusion does not apply to liability:

1.  that the INSURED would have in the absence of any contract or agreement; or

2.  that is assumed in a contract or agreement that is specifically scheduled to this policy by endorsement.

E.   Insured's Property/Care, Custody or Control

PROPERTY DAMAGE to property owned, leased or operated by, or in the care, custody or control of the INSURED, even if such  PROPERTY DAMAGE is incurred to avoid or mitigate LOSS or CLEAN-UP COSTS which may be covered under this Policy. This exclusion does not apply to RESTORATION COSTS or NATURAL RESOURCE DAMAGE.

F.   Abandoned, Relinquished, Divested, or Condemned Property

CLEAN-UP COSTS, CLAIMS, or LEGAL EXPENSE based upon or arising from any POLLUTION CONDITION on, at, under or migrating from any SCHEDULED LOCATION, where the actual discharge, dispersal, release, seepage, migration or escape of POLLUTANTS first commenced subsequent to the time such SCHEDULED LOCATION was sold, given away, abandoned, or relinquished by the INSURED, or condemned.

G.   Products Liability

CLEAN-UP COSTS, CLAIMS, or LEGAL EXPENSE based upon or arising out of goods or products manufactured, sold, handled, distributed, altered or repaired by the INSURED or by others trading under the INSURED's name after physical possession of such goods or products has been relinquished to others.

This exclusion does not apply to Coverage C –TRANSPORTATION POLLUTION COVERAGE only in the event that such coverage is endorsed to this policy.

H.   Intentional Acts

Any POLLUTION CONDITION that results from the intentional disregard of or the deliberate, willful or dishonest non-compliance by a RESPONSIBLE INSURED with any statute, regulation, ordinance, order, notice letter or instruction from, by or on behalf of any governmental body or entity.

I.   Hostile Acts

CLEAN-UP COSTS, CLAIMS, or LEGAL EXPENSE based upon or arising out of any consequence, whether direct or indirect, of war, invasion, act of foreign enemy, hostilities (whether war be declared or not), civil war, rebellion, revolution, insurrection or military or usurped power.

J.   Lead-Based Paint and Asbestos

CLEAN-UP COSTS, CLAIMS, or LEGAL EXPENSE based upon or arising out of the existence, required removal, or abatement of lead-based paint or asbestos, in any form, in any building or structure, including but not limited to products containing asbestos, asbestos fibers, asbestos dust, and asbestos containing materials. This exclusion does not apply to CLEAN-UP COSTS for lead or asbestos in the soil or groundwater.

K.   Underground Storage Tank(s)

CLEAN-UP COSTS, CLAIMS, or LEGAL EXPENSE based upon or arising out of the existence of any UNDERGROUND STORAGE TANK(S) on, at or under a SCHEDULED LOCATION. This exclusion does not apply to UNDERGROUND STORAGE TANK(S):

1.   Which have been closed, abandoned-in-place or removed prior to the inception date of this Policy, in accordance with all applicable Federal, State, Local or Provincial Regulations in effect at the time of closure, abandonment or removal;

2.   Listed in the Underground Storage Tank(s) Schedule endorsed onto this Policy, if any; or

3.   The existence of which is unknown by a RESPONSIBLE INSURED as of the inception date of this Policy.

L.   Other Insured

Any CLAIM by one INSURED against any other INSURED under this Policy.

M.   Material Change in Use or Operations

CLEAN-UP COSTS, CLAIMS, or LEGAL EXPENSE based upon or arising out of a material change in the use of, or a material change in the operations at, any SCHEDULED LOCATION from those set forth by the INSURED in the Application or related materials as of the inception date of this Policy unless previously consented to in writing by the Company. For the purpose of this exclusion, a material change in use shall also include any change in operation which would result in the imposition of a more stringent remediation standard.

N.   Aircraft, Auto or Watercraft

CLEAN-UP COSTS, CLAIMS or LEGAL EXPENSE resulting from a POLLUTION CONDITION that arises out of ownership, maintenance, use or entrustment to others of any aircraft, AUTO, rolling stock or watercraft owned or operated by or rented or loaned to any INSURED if such aircraft, AUTO, rolling stock or watercraft is beyond the legal boundaries of any SCHEDULED LOCATION.

This exclusion does not apply to Coverage C –TRANSPORTATION POLLUTION COVERAGE in the event that such coverage is endorsed to this policy.

V.   EXTENDED REPORTING PERIOD

A.   Automatic Extended Reporting Period:

The INSURED shall be entitled to a ninety (90) day Automatic Extended Reporting Period for no additional premium, commencing on the last day of the POLICY PERIOD, subject to the following terms and conditions:

1.   The Automatic Extended Reporting Period shall apply to a CLAIM first made against the INSURED during the POLICY PERIOD and reported in writing by the INSURED to the Company during the Automatic Extended Reporting Period and otherwise covered by this Policy.

2.   The Automatic Extended Reporting Period shall also apply to a CLAIM first made against the INSURED during the Automatic Extended Reporting Period, resulting from any POLLUTION CONDITION first discovered and reported in writing by the INSURED to the Company during the POLICY PERIOD and otherwise covered by this Policy. In this case, the CLAIM shall be deemed to have been made against the INSURED on the last day of the POLICY PERIOD.

3.   The Automatic Extended Reporting Period shall also apply to any POLLUTION CONDITION first discovered by the INSURED during the POLICY PERIOD, and reported in writing by the INSURED to the Company within the Automatic Extended Reporting Period and otherwise covered under this Policy.

4.   The Automatic Extended Reporting period does not increase or reinstate the Limits of Insurance.

The ninety (90) day Automatic Extended Reporting Period does not apply where:

a.   this Policy is terminated for fraud, misrepresentation or non-payment of premium as described in Section VIII. CONDITIONS, D. Cancellation; or

b.   the INSURED has purchased other insurance to replace this Policy, which provides coverage for a CLAIM and/or POLLUTION CONDITION.

B.   Optional Extended Reporting Period:

The FIRST NAMED INSURED shall be entitled to purchase an Optional Extended Reporting Period in the event this Policy is non-renewed, subject to the following terms and conditions:

1.  The Optional Extended Reporting Period shall become effective upon payment of an additional premium of not more than two hundred percent (200%) of the full Policy Premium. The Optional Extended Reporting Period shall be effective for thirty-six (36) months commencing on the last day of the POLICY PERIOD. The FIRST NAMED INSURED must provide a written request to purchase this Optional Extended Reporting Period within thirty (30) days from the last day of the POLICY PERIOD. The Automatic Extended Reporting Period of ninety (90) days will be merged into this period and is not in addition to this period.

2.  The Optional Extended Reporting Period shall only apply to a CLAIM first made against the INSURED during the Optional Extended Reporting Period, resulting from any POLLUTION CONDITION first discovered and reported by the INSURED in writing to the Company, during the POLICY PERIOD and otherwise covered by this Policy.

3.  The Optional Extended Reporting Period does not increase or reinstate the Limits of Insurance.

    The Optional Extended Reporting Period does not apply where:

    a.  this Policy is terminated for fraud, misrepresentation or non-payment of premium as described in Section VIII. CONDITIONS, D. Cancellation; or

    b.  the INSURED has purchased other insurance to replace this Policy, which provides coverage for a CLAIM and/or POLLUTION CONDITION.

It is a condition precedent to the operation of the rights granted under Item B. Optional Extended Reporting Period as referenced above that payment of the appropriate premium shall be made not later than thirty (30) days after expiration of this Policy in the case of non-renewal.

For purposes of Item B. Optional Extended Reporting Period as referenced above, the quotation of different terms and conditions by the Company shall not be construed as a non-renewal of this Policy.

## VI.  REPORTING, DEFENSE, SETTLEMENT AND COOPERATION

A.  Duties in the event of POLLUTION CONDITION or CLAIM

1.  You must notify the Company in writing as soon as practical at the address below of any POLLUTION CONDITION which may result in a CLAIM. To the extent possible, notice should include;

    a.  How, when and where the POLLUTION CONDITION took  place;

    b.  The names and addresses of the parties and witnesses involved;

    c.  Information regarding the time, place and nature of the POLLUTION CONDITION;

    Notice of a POLLUTION CONDITION is not notice of a CLAIM.

2.  When a CLAIM is made against any INSURED for LOSS or CLEAN-UP COSTS or any POLLUTION CONDITION is first discovered by any INSURED that results in a LOSS or CLEAN-UP COSTS, the INSURED must:

    a.  Immediately send the Company copies of any demands, notices, summonses or legal papers received in connection with the CLAIM and authorize us to obtain records and other information;

    b.  Fully cooperate with the Company and its designees in investigation or settlements, the conduct of suits or other proceedings, and enforcing any right of contribution or indemnity against another who may be liable to the INSURED because of BODILY INJURY, PROPERTY DAMAGE, LOSS or LEGAL EXPENSE.  The INSURED shall attend hearings and trials, assist in securing and giving evidence, and obtaining the attendance of witnesses, and upon the Company's request shall submit to examination by a representative of the Company, under oath if required; and

    c.  Assist the Company upon its request, in the enforcement of any right against any person or organization which may be liable to the INSURED because of injury or damage to which this insurance may also apply.

3.  No INSURED will, except at the INSURED'S own cost, voluntarily make any payment, assume any obligation, offer any settlement, or incur any LEGAL EXPENSE connected with a CLAIM, other than on an emergency basis for the protection of human health or the environment where any delay on the part of the INSURED would cause injury to persons or damage to property or increase significantly the cost of responding to any POLLUTION CONDITION, without the Company's consent. If such emergency occurs, the INSURED shall notify the Company as soon as practicable.

4.  All notices of a CLAIM and/or a POLLUTION CONDITION must be reported to:

> Rockhill Insurance Company
> Casualty Claims Department
> 700 W. 47th St., Ste. 350
> Kansas City, MO 64112
> Fax: 1-877-742-8762
> Or email: rhnewcasualtyclaims@rhkc.com

When reporting such information, please include your policy number, your contact information, and a description of the damage and the cause of your POLLUTION CONDITION or CLAIM. Please do not discuss the POLLUTION CONDITION or CLAIM with anyone other than Rockhill personnel or your own personal attorney.

B.  The Company shall have the right and duty to defend an INSURED against any CLAIM seeking damages for a LOSS or for CLEAN-UP COSTS covered by this Policy, and the Company will:

1.  Defend even if any of the charges of the CLAIM are groundless or false;

2.  Investigate any CLAIM the Company deems appropriate.

C.  Payment of the Limits of Insurance ends the Company's duty to defend or indemnify any INSURED or settle any CLAIM.

D.  The Company has the exclusive right to select defense counsel. If legal counsel has been retained prior to written notice of a CLAIM being submitted to the Company, the Company will only be responsible for reasonable and necessary LEGAL EXPENSES incurred by the INSURED.

E.  The Company has no duty to defend or pay any CLAIM not covered by this policy.

F.  The INSURED shall not admit liability or settle any CLAIM without the Company's consent. If the Company recommends a settlement of any CLAIM, the Company will present such settlement to the INSURED for the INSURED'S consent. If the INSURED fails to consent to such settlement and the settlement is acceptable to the claimant, the Limits of Insurance for the CLAIM shall be reduced to the amount for which the Company could have settled plus all LEGAL EXPENSE incurred up to the time the recommendation is made, which amount shall not exceed the remainder of the Limits of Insurance.

G.  If a POLLUTION CONDITION is first discovered and reported in writing by the INSURED to the Company during the POLICY PERIOD or, where applicable, the EXTENDED REPORTING PERIOD, and a CLAIM associated with such POLLUTION CONDITION is made against the INSURED and reported to the Company after the expiration of this Policy, such CLAIM shall be deemed to have been first made and reported on the last day of the POLICY PERIOD in which the POLLUTION CONDITION is first discovered, provided that the INSURED has maintained an equivalent policy with the Company on a continuous uninterrupted basis and the CLAIM is made against the INSURED and reported to the Company prior to the cancellation or expiration of such subsequent policy. It is further agreed that coverage for such CLAIM will not be provided under any subsequent policy issued by the Company.

VII.  TRANSFER OF LEGAL DEFENSE DUTIES

A.  If the Company believes that the applicable Limits of Insurance stated in the Declarations or any endorsement attached to this Policy has been or soon will be exhausted in defending a CLAIM or that the Company has paid out or will soon pay out the Aggregate Limit stated in the Declarations or any endorsement attached to this policy, the Company will provide written notification to the FIRST NAMED INSURED as soon as possible. The Company will advise that its duty to defend any CLAIM seeking damages within those Limits of Insurance has terminated, subject to payment of the Limits of Insurance, and that it will have no duty to defend or indemnify the INSURED for any CLAIM for which notice is given after the date it sends out such notice. The Company will take immediate and appropriate steps to transfer control of any existing defense prior to exhaustion of the limits to the FIRST NAMED INSURED. The FIRST NAMED INSURED agrees to reimburse the Company for any costs which the Company bears in connection with the transfer of the defense.

B.  The Company will take appropriate and necessary steps to defend the CLAIM during the transfer of the defense and avoid any unfavorable legal action provided that the FIRST NAMED INSURED cooperates in the transfer of the duties of the defense.

C.  The exhaustion of the applicable Limits of Liability by the payment of LOSS, CLEAN-UP COSTS, LEGAL EXPENSE and any other coverage afforded by endorsement will not be affected by the Company's failure to comply with any of the provisions of this section.

VIII.  CONDITIONS

A.  Limits of Insurance

After the INSURED'S deductible obligation has been satisfied, LEGAL EXPENSES shall be subtracted from the applicable Limits of Insurance under the Policy.  The remainder is the amount available to pay LOSS or CLEAN-UP COSTS.

The Limits of Insurance stated in the Declarations as "Each Pollution Condition" is the most the Company will pay for all LOSS, CLEAN UP COSTS and LEGAL EXPENSES that result from a single POLLUTION CONDITION or from a series of related POLLUTION CONDITIONS. Two *(2)* or more CLAIMS arising out of a single POLLUTION CONDITION or a series of related POLLUTION CONDITIONS at a SCHEDULED LOCATION shall be treated as a single CLAIM.  All such CLAIMS, whenever made, shall be considered first made during the POLICY PERIOD or EXTENDED POLICY PERIOD if any, in which the earliest CLAIM arising out of such POLLUTION CONDITION or related POLLUTION CONDITION was first made against the INSURED.  The inclusion herein of more than one INSURED or the making of CLAIMS or the bringing of suits by more than one person or organization shall not operate to increase the Company's Limits of Insurance.

The Limits of Insurance stated in the Declarations as "Aggregate Limit" is: (1) subject to the preceding paragraph and (2) the most the Company will pay under the Policy for all CLAIMS or CLEAN UP COSTS and their resulting CLAIM EXPENSES.

Any LOSS, CLEAN-UP COSTS, LEGAL EXPENSE and any other coverages afforded by endorsement incurred and reported to the Company, in writing, over more than one POLICY PERIOD, and resulting from the same or related POLLUTION CONDITION, shall be considered a single POLLUTION CONDITION. The LOSS, CLEAN-UP COSTS, LEGAL EXPENSE and any other coverages afforded by endorsement attached to this Policy will be subject to the same Limits of Insurance and the Deductible Amount in effect at the time the POLLUTION CONDITION was first reported to the Company, in writing, by the INSURED, during the POLICY PERIOD or, where applicable, the EXTENDED REPORTING PERIOD.

B.  Reimbursement

While the Company has no duty to do so, it may pay LOSS, CLEAN-UP COSTS, or LEGAL EXPENSES within the amount of the deductible. Should the INSURED fail to pay or advance the Deductible Amount after payment by the company, the INSURED will be responsible for all costs and attorneys fees incurred by the Company in its attempts to collect the Deductible Amount

The Company shall have the right and the duty to assume the investigation, adjustment or defense of any covered CLAIM. In case of the exercise of this right, the INSURED, on demand of the Company, shall promptly reimburse the Company for any element of LOSS, CLEAN-UP COSTS, LEGAL EXPENSE or any other coverages afforded by endorsement falling within the Deductible Amount stated in the Declarations or in any applicable endorsement attached to this policy.

C.   Inspection

The Company shall be permitted, but not obligated to, inspect and monitor on a continuing basis the INSURED'S property or operations at any SCHEDULED LOCATION, at any time. Neither the Company's right to make inspections and monitor nor the actual undertaking thereof nor any report thereon shall constitute an undertaking, on behalf of the INSURED or others, to determine or warrant that property or operations are safe, healthful or conform to acceptable engineering practice or are in compliance with any law, rule or regulation.

D.   Cancellation

The INSURED and the Company agree to the following with regard to cancellation:

1.   Cancellation by the FIRST NAMED INSURED – The FIRST NAMED INSURED may cancel this Policy at any time. The FIRST NAMED INSURED must mail a written notice to the Company telling when the FIRST NAMED INSURED wants the cancellation to be effective.  The Company must receive the policy or written notice before the cancellation date.  Delivery of a written notice is the same as mailing.  If the FIRST NAMED INSURED cancels the policy, return premium shall be computed at .9 times the pro rata unearned premium.  In the event of cancellation by the FIRST NAMED INSURED, the minimum earned premium percentage indicated on the Declarations shall apply.

2.   Cancellation by the Company – The Company can cancel this policy by delivering or mailing a written notice to the address shown in the Declarations.  The Company will give the FIRST NAMED INSURED this notice at least thirty (30) days before the effective date of cancellation. Delivery of written notice is the same as mailing.  If the FIRST NAMED INSURED has not paid a premium or deductible when due, the Company will only give the FIRST NAMED INSURED ten (10) days notice of cancellation.  The date and hour of cancellation will be shown in the notice.  Return premium shall be computed pro rata.  The Company will make the premium adjustment with the FIRST NAMED INSURED at the time that cancellation is effective or as soon as practicable after that time. However, this premium adjustment is not a condition of cancellation

The Company may cancel this Policy at any time, but only for the following reasons:

a.   the INSURED has made a material misrepresentation which affects the Company's assessment of the risk of insuring any SCHEDULED LOCATION; or

b.   the INSURED breaches or fails to comply with Policy terms, conditions, contractual duties, or any of its obligations under this Policy or at law; or

c.   the INSURED fails to pay the premium or fails to pay any Deductible or the Self-Insured Retention Amount for this Policy.

If the Company cancels this Policy, then the amount of premium returnable to the INSURED shall be computed pro rata and no minimum earned premium shall apply. In the event of cancellation of this Policy by the Company from item b) above, the INSURED shall have thirty (30) days from the date of notice to remedy such breach or failure to comply that is the cause for cancellation. If such remedy is satisfactory to the Company, in its sole discretion, during the applicable notice period, the Company will rescind the Notice of Cancellation with a written confirmation to the FIRST NAMED INSURED that the Policy shall remain in place.

If a CLAIM is made against the INSURED or a POLLUTION CONDITION is discovered during the POLICY PERIOD and coverage is requested from the Company by the INSURED during the POLICY PERIOD or, where applicable, the EXTENDED REPORTING PERIOD, then the total premium shall be considered one hundred percent (100%) earned, and the INSURED is not entitled to any return of premium upon cancellation by the INSURED.

E.  Application

By acceptance of this Policy, the INSURED agrees that:

1.  the statements in the application are the INSURED'S representations;

2.  those representations shall be deemed material;

3.  this policy is issued in reliance upon the truth of those representations;

4.  this policy is void if those representations are false; and

5.  this policy embodies all agreements existing between the INSURED and the Company relating to this insurance.

F.  Actions Against the Company

1.  An INSURED may not bring any legal action against the Company concerning this Policy until:

    a.  the INSURED has fully complied with all the provisions of this Policy; and

    b.  the amount of the INSURED'S obligation to pay has been decided.  Such amount can be set by judgment against the INSURED after actual trial or by written agreement between the INSURED, the claimant, and the Company.

2.  No person or organization has any right under this policy to include the Company in any action against the INSURED to determine the INSURED'S liability, nor will the INSURED or its representative bring the Company into such action.

G.  Assignment

An INSURED must first obtain our written consent to transfer or assign this policy.

H.  Subrogation

If the Company makes any payment, the Company is entitled to recover what it paid from other parties.  Any person or entity upon whose behalf the Company makes payment must transfer to the Company their rights of recovery against any other party.  This person or entity must do everything necessary to secure these rights and must do nothing that would jeopardize them.

I.  Changes

Notice to any agent or knowledge possessed by any agent or by any other person shall not effect a waiver or a change in any part of this Policy or estop the Company from asserting any right under the terms of this Policy; nor shall the terms of this Policy be waived or changed, except by endorsement issued to form a part of this Policy.

J.  Sole Agent

If there is more than one INSURED named in this policy, the FIRST NAMED INSURED shall act for all INSUREDS. The FIRST NAMED INSURED is responsible for payment of all premiums and deductibles. Notice of cancellation or non-renewal will only be sent to the FIRST NAMED INSURED and will serve as a notice to all of the INSUREDS.  Any premium refund will be sent to the FIRST NAMED INSURED.

K.  Other Insurance

If other valid and collectible insurance is available to the INSURED for CLEAN-UP COSTS, LOSS, or LEGAL EXPENSE covered under this Policy, our obligations are limited as follows:

1.  Excess Insurance

This insurance is excess over any other applicable insurance, whether or not such insurance is stated to be primary, excess, catastrophe, umbrella, contingent or on any other basis.

We will have no duty to defend the INSURED against any CLAIM that any other insurer has a duty to defend.  If no other insurer defends, we will undertake to do so, but we will be entitled to the INSURED'S rights against all those other insurers.

We will pay only our share of the amount of the CLEAN-UP COSTS, LOSS, OR LEGAL EXPENSE, if any, that exceeds the sum of:

   a.  The total amount that all such other insurance would pay in the absence of this insurance; and

   b.  The total of all deductible and self-insured amounts under all that other insurance.

We will share the remaining CLEAN-UP COSTS, LOSS or LEGAL EXPENSES, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Policy.

2.  Method Of Sharing

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the LOSS remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

L.  Headings

The descriptions in the headings of this Policy are solely for convenience and form no part of this Policy.

M.  Jurisdiction and Venue

It is agreed that in the event of the failure of the Company to pay any amount claimed to be due hereunder, the Company and the INSURED will submit to the jurisdiction of the State of Missouri and will comply with all the requirements necessary to give such court jurisdiction. Nothing in this clause constitutes or should be understood to constitute a waiver of the Company's right to remove an action to a United States District Court.

N.  Choice of Law

All matters arising hereunder including questions related to the validity, interpretation, performance, and enforcement of this Policy shall be determined in accordance with the law and practice of the State of Missouri (notwithstanding Missouri's conflicts of law rules).

O.  Severability

Except with respect to Limits of Insurance and any rights and duties assigned in this Policy to the FIRST NAMED INSURED, this insurance applies as if each INSURED were the only INSURED and separately to each INSURED against whom a CLAIM is made. Failure to pay a deductible amount by the FIRST NAMED INSURED will not compromise coverage that may be available to any other INSURED under the policy.

Any misrepresentation, act or omission that is in violation of a term, duty or condition under this Policy by one INSURED shall not by itself affect coverage for another INSURED under this Policy. However, this condition shall not apply to the INSURED who is a parent, subsidiary or affiliate of the INSURED which committed the misrepresentation, act or omission referenced above.

P.  Bankruptcy

Bankruptcy or insolvency of the INSURED will not relieve the Company of its obligations under the Policy.

POLICY NUMBER: ENVP012929-02

**IL 09 85 01 15**

**THIS ENDORSEMENT IS ATTACHED TO AND MADE PART OF YOUR POLICY IN RESPONSE TO THE DISCLOSURE REQUIREMENTS OF THE TERRORISM RISK INSURANCE ACT. THIS ENDORSEMENT DOES NOT GRANT ANY COVERAGE OR CHANGE THE TERMS AND CONDITIONS OF ANY COVERAGE UNDER THE POLICY.**

# DISCLOSURE PURSUANT TO TERRORISM RISK INSURANCE ACT

**SCHEDULE**

| SCHEDULE – PART I |
|---|
| **Terrorism Premium (Certified Acts)**        $500.00 <br> **This premium is the total Certified Acts premium attributable to the following Coverage Part(s), Coverage Form(s) and/or Policy(ies):** <br> RHIC 6801 09/08      SSP Legal Coverage Form <br><br><br><br><br><br> **Additional information, if any, concerning the terrorism premium:** <br> If TRIA is accepted, the premium shown above is 100% earned. |

| SCHEDULE – PART II |
|---|
| **Federal share of terrorism losses**          **See * below for Federal Share by year** <br> (Refer to Paragraph **B.** in this endorsement.) <br><br> * Federal share of Terrorism Losses 85% Year: 2015 Federal share of Terrorism Losses 84% Year: 2016 <br> Federal share of Terrorism Losses 83% Year: 2017 Federal share of Terrorism Losses 82% Year: 2018 <br> Federal share of Terrorism Losses 81% Year: 2019 Federal share of Terrorism Losses 80% Year: 2020 |

| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. |
|---|

**A. Disclosure Of Premium**

In accordance with the federal Terrorism Risk Insurance Act, we are required to provide you with a notice disclosing the portion of your premium, if any, attributable to coverage for terrorist acts certified under the Terrorism Risk Insurance Act. The portion of your premium attributable to such coverage is shown in the Schedule of this endorsement or in the policy Declarations.

**B. Disclosure Of Federal Participation In Payment Of Terrorism Losses**

The United States Government, Department of the Treasury, will pay a share of terrorism losses insured under the federal program. The federal share equals a percentage (as shown in Part **II** of the Schedule of this endorsement or in the policy Declarations) of that portion of the amount of such insured losses that exceeds the applicable insurer retention. However, if aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year, the Treasury shall not make any payment for any portion of the amount of such losses that exceeds $100 billion.

**C. Cap On Insurer Participation In Payment Of Terrorism Losses**

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

© Insurance Services Office, Inc., 2015
**IL 09 85 01 15**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION OF OTHER ACTS OF TERRORISM COMMITTED OUTSIDE THE UNITED STATES; CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

## SITE SPECIFIC POLLUTION LEGAL LIABILITY POLICY

**A.** The following exclusion is added:

This insurance does not apply to:

**TERRORISM**

"ANY INJURY OR DAMAGE" arising, directly or indirectly, out of an "OTHER ACT OF TERRORISM" that is committed outside the United States (including its territories and possessions and Puerto Rico), but within the "COVERAGE TERRITORY". However, this exclusion applies only when one or more of the following are attributed to such act:

**1.** The total of insured damage to all types of property exceeds $25,000,000 (valued in U.S. dollars). In determining whether the $25,000,000 threshold is exceeded, we will include all insured damage sustained by property of all persons and entities affected by the terrorism and business interruption losses sustained by owners or occupants of the damaged property. For the purpose of this provision, insured damage means damage that is covered by any insurance plus damage that would be covered by any insurance but for the application of any terrorism exclusions; or

**2.** Fifty or more persons sustain death or serious physical injury. For the purposes of this provision, serious physical injury means:

  **a.** Physical injury that involves a substantial risk of death; or

  **b.** Protracted and obvious physical disfigurement; or

  **c.** Protracted loss of or impairment of the function of a bodily member or organ; or

**3.** The terrorism involves the use, release or escape of nuclear materials, or directly or indirectly results in nuclear reaction or radiation or radioactive contamination; or

**4.** The terrorism is carried out by means of the dispersal or application of pathogenic or poisonous biological or chemical materials; or

**5.** Pathogenic or poisonous biological or chemical materials are released, and it appears that one purpose of the terrorism was to release such materials.

With respect to this exclusion, Paragraphs **1.** and **2.** describe the thresholds used to measure the magnitude of an incident of an "OTHER ACT OF TERRORISM" and the circumstances in which the threshold will apply for the purpose of determining whether this exclusion will apply to that incident.

**B.** The following definitions are added:

**1.** For the purposes of this endorsement, "ANY INJURY OR DAMAGE" means any injury or damage covered under any Policy to which this endorsement is applicable, and includes but is not limited to "BODILY INJURY", "PROPERTY DAMAGE", "LOSS", or CLEAN-UP COSTS" as may be defined in any applicable Policy.

**2.** "CERTIFIED ACT OF TERRORISM" means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to such Act. The criteria contained in the Terrorism Risk Insurance Act for a "CERTIFIED ACT OF TERRORISM" include the following:

  **a.** The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act;

  **b.** The act resulted in damage:

**(1)** Within the United States (including its territories and possessions and Puerto Rico); or

**(2)** Outside of the United States in the case of:

    **(a)** An air carrier (as defined in Section 40102 of title 49, United States Code) or United States flag vessel (or a vessel based principally in the United States, on which United States income tax is paid and whose insurance coverage is subject to regulation in the United States), regardless of where the loss occurs; or

    **(b)** The premises of any United States mission; and

**c.** The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

**3.** "OTHER ACT OF TERRORISM" means a violent act or an act that is dangerous to human life, property or infrastructure that is committed by an individual or individuals and that appears to be part of an effort to coerce a civilian population or to influence the policy or affect the conduct of any government by coercion, and the act is not a "CERTIFIED ACT OF TERRORISM".

Multiple incidents of an "OTHER ACT OF TERRORISM" which occur within a seventy-two hour period and appear to be carried out in concert or to have a related purpose or common leadership shall be considered to be one incident.

**C.** The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for injury or damage that is otherwise excluded under this Coverage Part.

**D.** If aggregate insured losses attributable to terrorist acts certified under the federal Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

© ISO Properties, Inc., 2007
Includes copyrighted material of  Insurance Services Office, Inc.
with its permission

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# SCHEDULED LOCATIONS ENDORSEMENT

This endorsement modifies insurance provided under the following:

**SITE-SPECIFIC POLLUTION LEGAL LIABILITY POLICY**

In consideration of an additional premium of $ Included        , it is agreed that form RHIC 6800, SITE-SPECIFIC POLLUTION LEGAL LIABILITY POLICY DECLARATIONS is amended to include the SCHEDULED LOCATIONS and RETROACTIVE DATES listed in the schedule below.

Scheduled Location(s):                                          Retroactive Date(s):

| | |
|---|---|
| 2)    92 Washington Street<br>        Uniontown, AL 36786 | 03/18/2012 |

All other terms and conditions remain unchanged.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**NOTICE OF SERVICE OF SUIT**

In the event you feel that we have failed to pay a claim according to the terms of the policy, you may start "suit" against us.  We will obey the order of any Court of competent jurisdiction within the United States and will comply with all requirements necessary  to give the Court jurisdiction, and all such matters shall be determined according to the law and practice of the Court.

In any "suit" brought against us concerning your policy, we will abide by the final decision of the Court, including any appellate Court in the event of the appeal.

Service of Suit may be made upon the General Counsel of Rockhill Insurance Company, 700 W. 47th Street, Suite 350, Kansas City, MO 64112.  He is authorized and directed to accept Service of Suit on our behalf and/or provide written notice that we will appear in Court, if "suit" is  instituted.

If required by your state statutes, we hereby designate the Commissioner of Insurance, or any other officer specified by the statute, or his successors in office, as our true and lawful attorney for Service of Suit instituted by you, or on your behalf or on behalf of your beneficiary, in regard to your policy, and designated that such process should be mailed to the General Counsel of Rockhill Insurance Company at our address  shown above.

All other terms, conditions and agreements remain unchanged.

# SIGNATURE ENDORSEMENT

By signing and delivering the policy to you, we state that it is a valid contract when countersigned by our authorized representative

**ROCKHILL INSURANCE COMPANY**
Kansas City, Missouri

_____
Melissa A. Centers
Secretary

_____
Michael E. LaRocco
President

**RHIC 1101 (01/16)**                                                                                           Page 1 of 1

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT
### (Broad Form)

This endorsement modifies insurance provided under the following:

**COMMERCIAL GENERAL LIABILITY COVERAGE PART
SITE SPECIFIC POLLUTION LIABILITY COVERAGE PART
TRANSPORTATION POLLUTION LIABILITY COVERAGE PART
CONTRACTORS POLLUTION LIABILITY COVERAGE PART
COMMERCIAL EXCESS LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
SITE SPECIFIC POLLUTION LEGAL LIABILITY COVERAGE PART**

**1.** The insurance does not apply:

**A.** Under any Liability Coverage, to "bodily injury" or "property damage":

**(1)** With respect to which an "insured" under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

**(2)** Resulting from the "hazardous properties" of "nuclear material" and with respect to which **(a)** any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or **(b)** the "insured" is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

**B.** Under any Medical Payments coverage, to expenses incurred with respect to "bodily injury" resulting from the "hazardous properties" of "nuclear material" and arising out of the operation of a "nuclear facility" by any person or organization.

**C.** Under any Liability Coverage, to "bodily injury" or "property damage" resulting from "hazardous properties" of "nuclear material", if:

**(1)** The "nuclear material" **(a)** is at any "nuclear facility" owned by, or operated by or on behalf of, an "insured" or **(b)** has been discharged or dispersed therefrom;

**(2)** The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of, by or on behalf of an "insured"; or

**(3)** The "bodily injury" or "property damage" arises out of the furnishing by an "insured" of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility", but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion **(3)** applies only to "property damage" to such "nuclear facility" and any property thereat.

**2.** As used in this endorsement:

"Hazardous properties" includes radioactive, toxic or explosive properties.

"Nuclear material" means "source material", "Special nuclear material" or "by-product material".

"Source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

"Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor".

"Waste" means any waste material **(a)** containing "by-product material" other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content, and **(b)** resulting from the operation by any person or organization of any "nuclear facility" included under the first two paragraphs of the definition of "nuclear facility".

"Nuclear facility" means:

**(a)** Any "nuclear reactor";

**(b)** Any equipment or device designed or used for **(1)** separating the isotopes of uranium or plutonium, **(2)** processing or utilizing "spent fuel", or **(3)** handling, processing or packaging "waste";

**(c)** Any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the "insured" at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

**(d)** Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste";

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

"Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

"Property damage" includes all forms of radioactive contamination of property.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION OF PUNITIVE DAMAGES
# RELATED TO A CERTIFIED ACT OF TERRORISM

This endorsement modifies insurance provided under the following:

**COMMERCIAL GENERAL LIABILITY COVERAGE PART
SITE SPECIFIC POLLUTION LIABILITY COVERAGE PART
TRANSPORTATION POLLUTION LIABILITY COVERAGE PART
CONTRACTORS POLLUTION LIABILITY COVERAGE PART
COMMERCIAL EXCESS LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
SITE SPECIFIC POLLUTION LEGAL LIABILITY COVERAGE PART
PRODUCTS POLLUTION COVERAGE**

**A.** The following exclusion is added:

This insurance does not apply to:

**TERRORISM PUNITIVE DAMAGES**

Damages arising, directly or indirectly, out of a "certified act of terrorism" that are awarded as punitive damages.

**B.** The following definition is added:

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to such Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

**1.** The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

**2.** The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

**C.** The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for injury or damage that is otherwise excluded under this Coverage Part.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# CANCELLATION / NON-RENEWAL

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
COMMERCIAL EXCESS LIABILITY COVERAGE PART
CONTRACTORS POLLUTION LIABILITY COVERAGE PART
OWNERS & CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
SITE SPECIFIC POLLUTION LIABILITY COVERAGE PART
TRANSPORTATION POLLUTION COVERAGE PART
SITE-SPECIFIC POLLUTION LEGAL LIABILITY POLICY
COMMERCIAL PROPERTY COVERAGE PART
COMMERCIAL UMBRELLA COVERAGE PART
PROFESSIONAL LIABILITY COVERAGE PART

If the cancellation and/or non-renewal requirements for the insured location are not shown in our policy, or notice requirements are other then shown in our policy, we will comply with those State requirements.

All other terms and conditions remain unchanged.