**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | |
|---|---|
| **ROCKHILL INSURANCE COMPANY,** | )<br>)<br>) |
| Plaintiff, | )<br>) |
| v. | ) Case No.: 2:18-CV-268-KD-B<br>) |
| **SOUTHEASTERN CHEESE CORPORATION, et al.** | )<br>)<br>) |
| Defendants. | ) |

# EXHIBIT 1 TO
## DEFENDANT SOUTHEASTERN CHEESE CORPORATION'S RESPONSE TO MOTION FOR SUMMARY JUDGMENT

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| ROCKHILL INSURANCE COMPANY, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Case No.: 2:18-CV-268-KD-B ) |
| SOUTHEASTERN CHEESE CORPORATION, et al. | ) ) ) |
| Defendants. | ) ) |

## DECLARATION OF PAT RANKIN

I, Pat Rankin, hereby declare as follows:

1. I am President of Southeastern Cheese Corporation ("SEC"). I submit this Declaration based on my personal knowledge, and after reviewing the documents maintained by SEC in the ordinary course of business and of those documents submitted in support of or cited by Rockhill Insurance Company in its Motion for Summary Judgment.

### Background

2. I grew up outside of Faunsdale, Alabama, approximately 10 miles west of Uniontown, from 1951 until 1967, when I went away to school. I later returned and live there today.

3. During my childhood, my family made a living as dairy farmers. Their farming operations included raising cattle and growing hay, soybeans, and corn in fields in the immediate vicinity of the cheese plant currently operated by SEC. Beginning at the age of 14, in approximately 1965, I worked in those fields.

4. At the time, cheesemaking was taking place at the plant located at 92 Washington Street, Uniontown, Alabama, but under different ownership than today.

5. Whey is an organic byproduct of cheesemaking and, although it can be used in such products as protein drinks and baby formula, the plant discharged its whey through a variety of different lawfully permitted methods over the years. The discharge of whey historically has caused a sour odor on occasion and on some days the odor was better or worse than others. However, this has been the case as long as I can remember. People talked about the smell, when it smelled, like you talked about the weather or humidity.

### SEC's Operations of the Cheese Plant

6. SEC's own cheesemaking operations at the plant date back to 1996 (when SEC acquired the plant), although the plant has been the site of cheese production since at least 1933.

7. Like the plant's previous owner, initially SEC generally found it best to simply spray the whey on neighboring fields for irrigation and fertilization. For many years, tanker trucks or spray-tank trailers did the spraying. They were loaded at the plant and towed by tractors to nearby fields for spraying. This was a common technique for managing whey throughout the United States and in other countries.

8. From 1996 through 2004, the cheese plant managed its whey primarily by spraying it on nearby fields with the consent of (and, often, at the specific request of) the fields' owners.

### Whey Piped to Uniontown POTW

9. On August 31, 2004, Southeastern Cheese, LLC obtained State Indirect Discharge Permit IU-39-53-00113 from ADEM. This permit authorized SEC to pipe its whey to the nearby City of Uniontown publicly-owned treatment works ("Uniontown POTW") but required that certain permit limitations be met.

10. SEC recognized that its whey needed to be pre-treated before being piped to the Uniontown POTW and so it caused to be constructed a collection of anaerobic and aerobic digester ponds and lagoons constructed and operated by SEC affiliate Southeastern Energy and Fertilizer, LLC (the "pre-treatment facility") to do so.

11. SEC began pre-treating its whey but had difficulty meeting the permit limitations of State Indirect Discharge Permit IU-39-53-00113 in 2009.

12. We believed that there were several potential reasons for these problems. In particular, on March 4, 2008, a tornado hit the pre-treatment facility and damaged the facility and, in doing so, created a chemical and organic imbalance in the pre-treatment system. This created a series of ongoing problems for the facility.

13. In the meantime, on or about April 4, 2010, a pump failed in the wet well at the cheese plant. The pump was intended to pump whey and process water from the cheese plant to the plant's pre-treatment facility and, when it failed, the well overflowed. Some of the overflow ultimately reached a nearby tributary to Cottonwood Creek. The incident did not involve SEC's lagoon system or sprayfields.[1] SEC self-reported the incident to ADEM and ADEM did not issue a violation.

14. On May 18, 2010, ADEM entered an Order finding Southeastern Cheese, LLC[2] had exceeded the permit limits set by State Indirect Discharge Permit IU-39-53-00113 during time

---

[1] I believe that this is the incident referenced in the Complaint filed in the matter *Southeastern Cheese Corporation et al. v. CFM Group, LLC, et al.*, 53-CV-2016-900043.00 (Circuit Court of Perry County, Aug. 11, 2016) in Paragraph 14 as having occurred "on or about June 11, 2010." Although certain response costs were incurred at the time, SEC did not "pay ADEM fines, legal defense costs, environmental remediation fees as well as charges for equipment rental, repair/replacement and maintenance costs" associated with the April 4, 2010, incident as I have read alleged in Rockhill's Motion for Summary Judgment.

[2] At the time of the 2010 Order, SEC was the owner and operator of the cheese plant but Southeastern Cheese, LLC held the SID permit.

period February 2009 through June 2009. I believe that ADEM's allegations were all based on information that SEC self-reported to ADEM.

15. SEC retained CFM Group, LLC, to do a study of the overall situation in the hope of determining causes and identifying solutions. On or about June 3, 2011, CFM Group issued a report entitled "Process Wastewater Treatment System Investigation Report for Southeastern Cheese, LLC" ("2011 Report").

16. The 2011 Report recommended that SEC undertake certain operational and maintenance measures at the pre-treatment plant and also to begin to look into the land-application of the whey in a sprayfield.

### Whey Sprayed in Sprayfields

17. On or near April 8, 2012, SEC stopped sending whey to the Uniontown POTW and began piping the whey to a nearby field where it was sprayed with a nozzle system designed by CFM Group LLC. The sprayfield was (and is) owned by a company, Crosscreek Farm, LLC, affiliated with SEC. Later, a second sprayfield, also owned by Crosscreek Farm, LLC, was put into operation. Because of the sprayfields' role in enabling SEC to manage its whey and its connection to the plant by a pipeline, we considered them to be a part of SEC's cheese-making operation.

18. Over the course of the next two years, CFM Group worked to install, modify, and, as necessary, adapt the sprayfield operation to achieve adequate spraying and dispersal of the whey.

19. On July 2 and 3, 2014, workers pumped out treated wastewater out of one of SEC's pre-treatment ponds (in order to conduct equipment maintenance in it) and into a stormwater retention pond. The workers did not realize, however, that the stormwater pond was not fully

contained and that it drained directly into a ditch that ultimately led to Cottonwood Creek. The result was an accidental spill of approximately 50,000 gallons of treated wastewater to Cottonwood Creek which SEC reported to ADEM.

20. Following the July 2014 incident, SEC and ADEM negotiated a draft Consent Order to resolve the violations of law and ADEM regulations arising from the wastewater spill. ADEM publicly noticed a draft of the proposed consent order in December 2014.

21. ADEM received comments from the public on the draft consent order. The comments were not sent to SEC but were sent to ADEM. I do not recall seeing those comment letters but generally was aware comments had been submitted with respect to the consent decree requesting a public hearing on the draft order. I do not recall that a hearing was ever held.

### SEC's Application for Pollution Insurance in 2015

22. Near the end of 2014 or in early 2015, our insurance broker, Burgett Tounsmeire, of Cobbs Allen, visited SEC. As was his practice, he asked if SEC had added anything or if it was doing anything differently. During his visit, he not only visited the cheese plant (where our offices are located) but also the associated sprayfields. While at the sprayfields, Mr. Tounsmeire recommended that SEC obtain pollution liability insurance to cover liabilities associated with that operation.

23. Mr. Tounsmeire provided me with a Site Specific Pollution Liability Application ("2015 Insurance Application") to obtain such pollution liability insurance from Rockhill Insurance Company. Working from my office at the cheese plant in Uniontown, Alabama, and from my home office in Marengo County, Alabama, I filled out the 2015 Insurance Application to the best of my actual knowledge at the time, making sure to note the existence of both the cheese plant and the associated sprayfields. We provided the application to Mr. Tounsmeire.

24. I have read, in Paragraph 19 of Rockhill's Brief in Support of Motion for Summary Judgment, that "just days after being notified that ADEM had received what appeared to be the most negative comments to a proposed consent order on environmental violations in its history, SEC sought, for the first time, to procure pollution liability coverage for the exact sprayfield system involved in ADEM's multiple investigations and resulting violations and fines."

25. I disagree with Rockhill's characterizations in Paragraph 19. I do not recall ever seeing the email referenced in Paragraph 18 sent by ADEM to Chris Waller and Brooke Reid, who were SEC's lawyers and who did not share Ms. Espy's email with me. Regardless, the decision to insure the cheese plant and the sprayfields resulted from our broker's suggestion that we do so.

26. Furthermore, as of the time that I filled out the 2015 Insurance Application, the sprayfield had not been "involved in ADEM's multiple investigations and resulting violations and fines," as stated in its Paragraph 19. The only time that SEC's sprayfield operation had been investigated and found to be in violation of ADEM regulations at this point had been associated with practices thirteen years earlier and long since resolved.

27. The 2015 Insurance Application asked the following as Question 18: "Have you during the last five years received any violations regarding any standard or law relating to the Release of a substance from the location(s) into sewers, rivers, air or on land?"

28. The 2015 Insurance Application provided no guidance as to what Question 18 meant by "received any violations" but I read this to mean that ADEM or EPA had issued a formal violation to SEC like we had received in 2010 with respect to the discharge exceedances and following the July 2014 even with respect to the proposed consent decree. I marked "Yes" in response to Question 18 because of the violations where we had received an Order or proposed

6

order from ADEM associated with our discharges to the POTW and the July 2014 spill described above.

29. Question 18 further stated "If yes, please provide details."

30. I identified the two incidents on the application of which I knew in which SEC had received a violation. This included, "1. water out of spec going to city lagoon" which related to the May 18, 2010 discharge limitation violations, and "2. Rainwater containment pond spilled into creek," which described the release event in July 2014 that resulted in the draft consent order. Only two lines were provided for details. My understanding was the question wanted me to describe the basic issues that had occurred. I did not read the question <u>to ask for the information Rockhill has since said should also have been included in the application (issues with the sprayfield, etc.)</u>

31. Question 18 also asked that, if I had answered "Yes" above, to further answer the question "have you ever been prosecuted?" I checked "No" to the question regarding prosecution because I thought this meant being charged and tried for criminal violations of a law and SEC had never been "prosecuted." I already had answered that we received a violation in the earlier part of the question and did not understand this second half of the question to be asking whether we had received fines, a lawsuit, or a negotiated Consent Order.

32. Question 19 in the 2015 Insurance Application asked SEC to "[p]lease describe any pollution claims which have occurred during the last five years."

33. In answer to Question 19, I wrote "None." I read "pollution claims" to mean a pollution claim under a pollution insurance policy. I had never had a pollution policy before this one. The next Question 20 also used the phrase "give rise to a claim under this policy." Since we

7

had never made a "pollution claim" and did not even have pollution coverage at the time, I answered "None."

34. Question 20 of the 2015 Insurance Application asked, "At the time of signing this application are you aware of any circumstances which may reasonably be expected to give rise to a claim under this policy?"

35. At the time of signing the application, I was not aware of any circumstances that I expected to give rise to a claim under the policy. The events in 2010 had long been resolved, and SEC had stopped discharging whey to the Uniontown POTW in April 2012. Also, I thought that the July 2014 spill was a one-time event that was being addressed to ADEM's satisfaction. I understood there was going to be a Consent Order. Further, I asked Cobbs Allen whether regulatory fines for smell could be covered and was told they would not be. For that reason, and given the cost of the policy, we continued to debate internally whether to even purchase the policy.

36. As far as the public comments to ADEM were concerned, I had not read them at the time and, based on what I understood of them, they did not threaten lawsuits or the kinds of actions that would give rise to a claim under an insurance policy.

37. I was never contacted by Rockhill's broker or any of its representative for further information or explanation of my answers to any of the questions on this or any future application. If someone had asked me, I would have answered any questions and, for that matter, would have welcomed a site visit to our cheese plant and sprayfields if first-hand knowledge had been desired.

### Later Events

38. On April 1, 2015, the berm alongside one of SEC's sprayfields breached after a heavy rain event. Stormwater that had been contained behind the berm flowed into Cottonwood Creek before the berm could be repaired. SEC self-reported the unintentional discharge to ADEM.

8

39. On June 5, 2015, ADEM filed a lawsuit against SEC in the Circuit Court of Marengo County regarding the release events to the creek that resulted in the Consent Decree entered August 6, 2015.

40. The Consent Decree required SEC to either obtain an NPDES permit (to allow discharges directly into Cottonwood Creek) or revise its Nutrient Management Plan that governed sprayfield operations. Because Cottonwood Creek was unlikely to be able to handle the direct discharge of whey into it, SEC decided to opt to revise the sprayfields' Nutrient Management Plan. It also required SEC to pay a fine that I was told by Cobbs Allen would not be covered by our insurance policy.

41. SEC hired Neel-Schaffer as its new engineering firm and, on October 22, 2015, Neel-Schaffer submitted its "Nutrient Management Plan and Engineering Report" to ADEM for ADEM's review.

42. On December 24, 2015, the Black Warrior Riverkeeper ("Riverkeeper") sent a letter threatening to bring a Clean Water Act citizen suit against SEC for the discharges to Cottonwood Creek that I understood were being resolved through the Consent Decree. Based on my conversations with Mr. Tounsmeire about the ADEM Order, we did not believe this letter was covered by our policy with Rockhill. We never made a claim under our Rockhill policy for either the ADEM or Riverkeeper matters.

### SEC's Application for Renewal of Pollution Insurance in 2016

43. In 2016, I completed an application to renew our insurance with Rockhill and filled out the renewal application to the best of my actual knowledge at the time.

9

44. The 2016 renewal application used the same form and asked the same questions as did the earlier application from 2015 and I read it the same way as described earlier in my Declaration.

45. As with the 2015 Insurance Application, I marked "Yes" in response to Question 18 because of the release violation to the creek. To provide the details in the space provided, I wrote "self-reported a one-time wastewater spill into a storm drain." I described it as a one-time spill because it was unlike the violations we had received on May 18, 2010, where we exceeded our permit limitations from the period February 2009 to June 2009. I believed I had addressed the matters giving rise to the ADEM violations and consent decree and at issue in the Riverkeeper letter. Only two lines were provided for details. I did not understand Question 18 <u>to be asking for the information Rockhill has since said should also have been included in the application (issues with the sprayfield, etc.)</u>

46. I checked "No" to the question regarding prosecution because I understood "prosecution" to mean being charged and tried for criminal violations of a law and SEC had never been so "prosecuted." I already had answered that we received a violation in the earlier part of the question and did not understand this second half of the question to be asking whether we had received fines, a lawsuit, or a negotiated Consent Order.

47. Question 19 in the 2016 Insurance Application asked SEC to "[p]lease describe any pollution claims which have occurred during the last five years." In answer to Question 19, I wrote "None." As I had done previously, I interpreted "pollution claims" to mean a pollution claim under a pollution insurance policy. SEC had not made any such claims and so I answered "N/A."

48. Question 20 of the 2016 Insurance Application asked, "At the time of signing this application are you aware of any circumstances which may reasonably be expected to give rise to a claim under this policy?"

49. At the time of signing the application, I was not aware of any circumstances that I expected to give rise to a claim under the policy. Nothing had changed since the prior application, except that the Riverkeeper had said it would file a lawsuit for the discharges to Cottonwood Creek I thought were being addressed by the ADEM Consent Decree. The Consent Decree had resolved any issues associated with the one-time release events to Cottonwood Creek to everyone's satisfaction. Because of that and based on what Cobbs Allen had told me about what the Rockhill policy covered and did not cover, I did not expect to make a claim under the Rockhill policy with respect to these matters.

50. I signed the 2016 Insurance Application at my office at SEC in Uniontown, Alabama, on February 10, 2016, and sent it to Mr. Tounsmeire. I was never contacted by Rockhill's broker or any of its representatives for further information or explanation of my answers to any of the questions on this or any future application. If someone had asked me, I would have answered any questions and, for that matter, would have welcomed a site visit to our cheese plant and sprayfields if first-hand knowledge had been desired.

### Later Events

51. On February 26, 2016, the Riverkeeper filed its lawsuit against SEC. I again asked Cobbs Allen whether the suit might be covered. I did not have an expectation that it would be based on what I had been told in the past but given the prospect of more attorney fees I wanted to ask again. No claim was submitted with Rockhill because Cobbs Allen did not believe the claim would be covered under the policy.

11

52. In the summer of 2016, we received several calls from people about odor. The complaints seemed to come in at the same time, and we thought they might be related to Riverkeeper trying to get community support for its lawsuit as it had done in the ADEM comment proceeding. I also heard a rumor from one of our employees that someone was trying to get a petition up against SEC. I talked with ADEM on several occasions that summer regarding these complaints. At the time, I thought odors from the plant were much less than normal. Also, the Nutrient Management Plan was being revised by Neel-Schaffer, which I thought would further improve matters and resolve ADEM's concerns about odors.

53. For all of my life, we had heard complaints from time-to-time about odor from both the cheese operations and the nearby Uniontown POTW. In fact, many times we believe odors were related to the sewage at the Uniontown POTW. The cheese plant had operated for nearly 80 years in Uniontown and there had always been some odor associated with cheese-making. However, I had been working at the cheese plant for over ten years and we had never had a lawsuit filed by anyone for odor or concerning our operations. Oftentimes, odors resulted from the Uniontown POTW. With respect to SEC's operations, it was my belief that, with Neel-Schaffer under contract and with improvements being made to the sprayfield operation, the situation would only get better and that any issues with odor related to our operations would be improved.

54. In January of 2017, the Riverkeeper lawsuit suit was dismissed. By that time, the odor complaints had, to my knowledge, stopped. Odors had been reduced to levels much lower than experienced in SEC's historic operations. SEC's work with Auburn University, in coordination with ADEM, on the Nutrient Management Plan was expected to result in substantial operational recommendations that we expected to further lessen any odors at the site.

## SEC's Application for Renewal of Pollution Insurance in 2017

55. In April 2017, I completed SEC's application to renew the policy with Rockhill. I filled out the 2017 renewal application to the best of my actual knowledge at the time. The renewal application used the same form and asked the same questions as did the earlier application forms from 2015 and 2016, and I read it the same way as described earlier in my Declaration.

56. As with the 2015 and 2016 Insurance Applications, I marked "Yes" in response to Question 18 which asked, "Have you during the last five years received any violations regarding any standard or law relating to the Release of a substance from the location(s) into sewers, rivers, air or on land?" Where asked to provide details in the two lines provided, I wrote "self-reported one-time wastewater spill." I meant this to describe the spill to Cottonwood Creek that had given rise to the ADEM consent decree and lawsuit and ultimately at issue in the Riverkeeper lawsuit. Again, because it was not like the repeated permit violations, we had in 2010, I described it as a "one-time waste water spill." I did not understand Question 18 or any part of the application <u>to be asking for the information Rockhill has said should also have been included (issues with the sprayfield, etc.)</u> I believed I had accurately described the information Rockhill would want to know including that ADEM had cited us for discharging accidentally to the creek.

57. As in 2016, I checked "No" to the question regarding prosecution because I understood "prosecution" to mean being charged and tried for criminal violations of a law and SEC had never been so "prosecuted." I already had answered that we received a violation in the earlier part of the question and did not understand this second half of the question to be asking whether we had received fines, a lawsuit, or a negotiated Consent Order.

58. Question 19 in the 2017 Insurance Application asked SEC to "[p]lease describe any pollution claims which have occurred during the last five years."

13

59. In answer to Question 19, I wrote "N/A." As I had done previously, I interpreted "pollution claims" to mean a pollution claim under the Rockhill insurance policy. SEC had not made any such claims and so I answered "N/A."

60. Question 20 of the 2017 Insurance Application asked, "At the time of signing this application are you aware of any circumstances which may reasonably be expected to give rise to a claim under this policy?"

61. At the time of signing the application, I was not aware of any circumstances that I expected to give rise to a claim under the policy. Three months earlier, the Riverkeeper suit had been dismissed in SEC's favor. The odor complaints we had received in the summer of 2016 had, to my knowledge, stopped. I do not recall hearing anything further with respect to the rumors about a petition and the dismissal of the Riverkeeper lawsuit would have only caused me to think that issue had resolved. I was confident that ongoing development of revisions to our Nutrient Management Plan would be implemented when finished and approved. It seemed that we were entering the light at the end of the tunnel with respect to these issues.

62. While SEC had always heard odor complaints from time to time, they had never resulted in a lawsuit. Further, I do not remember ever receiving any threat of a lawsuit from any of the plaintiffs in the *Calhoun*, *Jones* and *Belcher* cases. Based on my understanding, I did not expect, at the time I was signing the 2017 Insurance Application, to be making a claim under the Rockhill policy.

63. I signed the 2017 Insurance Application at my office at SEC in Uniontown, Alabama, on April 10, 2017, and sent it to Mr. Tounsmeire. I was never contacted by Rockhill's broker or any of its representatives for further information or explanation of my answers to any of

of the plaintiffs in the *Calhoun*, *Jones* and *Belcher* cases. Based on my understanding, I did not expect, at the time I was signing the 2017 Insurance Application, to be making a claim under the Rockhill policy.

63. I signed the 2017 Insurance Application at my office at SEC in Uniontown, Alabama, on April 10, 2017, and sent it to Mr. Tounsmeire. I was never contacted by Rockhill's broker or any of its representatives for further information or explanation of my answers to any of the questions on this or any future application. If someone had asked me, I would have answered any questions.

### Later Events

64. In February 2018, Esther Calhoun and other Uniontown residents filed a lawsuit against SEC regarding our sprayfield operations. A few months later, lawsuits were filed by Alex Jones, Matthew Sims, Henry Sims, and William Belcher regarding the same. During the entire course of the ADEM and Riverkeeper proceedings, none of the individuals in these lawsuits ever told me they were damaged or that they would be filing a lawsuit against SEC. Further, no individual told me that they planned to file a lawsuit against SEC. These lawsuits were the first time I ever made a claim under my policy with Rockhill.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on the 26 day of November, 2019.

_____
Pat Rankin

15