**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | |
|---|---|
| **ROCKHILL INSURANCE COMPANY,** )<br>    **Plaintiff,** )<br> )<br>**v.** )<br> )<br> )<br>**SOUTHEASTERN CHEESE** )<br>**CORPORATION, et al.,** )<br> )<br>    **Defendants.** ) | **CIVIL ACTION NO. 2:18-cv-268-KD-B** |

## <u>ORDER</u>

This matter is before the Court on Plaintiff Rockhill Insurance Company's motion for summary judgment (Docs. 94, 95, 97); Defendant Southeastern Cheese Corporation's Response (Docs. 103[1], 104); Defendants William M. Belcher, Alex Jones, Jr., Henry Sims, and Matthew Sims' Response (Doc. 105); and Plaintiff's reply (Docs. 108, 110).

## I.  <u>Findings of Fact</u>[2]

Defendant Southeastern Cheese Corporation (SEC) operates a cheese manufacturing plant in Uniontown, Alabama. (Doc. 97-1 at 7, 15). Pat Rankin (Rankin) wholly owns SEC.[3] (Id.). SEC's

---

[1] Defendant SEC subsequently filed a motion for partial relief from Local Rule 5(a)(2). (Doc. 106). Local Rule 5(a)(2) requires "[f]ont must be 12 point or larger, *including footnotes*." SEC's footnotes sizing does not comport with Local Rule 5(a)(2) because its footnotes are 11 point font instead of 12 point font. Notwithstanding these defects, the Court in its discretion will accept and consider SEC's submission in its current form.

[2] At the summary judgment stage, the facts are taken in the light most favorable to the non-movant. Tipton v. Bergrohr GMBH–Siegen, 965 F.2d 994, 998-99 (11th Cir. 1992). The "facts, as accepted at the summary judgment stage of the proceedings, may not be the actual facts of the case." Priester v. City of Riviera Beach, 208 F.3d 919, 925 n. 3 (11th Cir. 2000).

[3] The plaintiff names three entities in its complaint: Southeastern Cheese Corporation is the entity that makes the cheese; Southeastern Energy and Fertilizer, LLC treats the wastewater before it is sprayed onto the sprayfield; Crosscreek Farm, LLC owns Sprayfields #1 and #2. (Doc. 97-1 at 11). Rankin is 100% owner of each entity. SEC is the entity named in the ADEM findings in Doc. 95-2.

production of cheese produces a waste product called whey. (Id. at 8). SEC disposes of this waste product by transporting the whey wastewater through pipes to a sprayfield. (Id.). The Alabama Department of Environmental Management (ADEM) is "the state agency responsible for the promulgation and enforcement of water pollution control regulations in accordance with the Federal Water Pollution Control Act....[and] is authorized to administer and enforce the provisions of the Alabama Water Pollution Act…" (Doc 95-2 at 2). SEC uses the sprayfield system to disperse the wastewater because ADEM required SEC do so. (Doc. 97-1 at 8). ADEM prohibits SEC from dispersing wastewater directly into nearby water sources. (Id. at 9).

SEC has received various penalties for problems relating to the discharge of the wastewater from its cheese manufacturing plant. In May 2010, ADEM imposed a $120,000 civil penalty on SEC for "exceeding Permit limitations" for the discharge of various pollutants. (Doc. 95-2 at 3). On June 11, 2010, ADEM notified SEC that "an overflow of wastewater had occurred into nearby 'Cottonwood Creek' from the SEC lagoon system;" SEC paid another fine and other fees as a result. (Doc. 95-3). Partially in response to ADEM's findings, SEC built sprayfield systems to disperse their wastewater byproduct. (Doc. 97-1 at 17). SEC "believes the north part of [the sprayfield system, Sprayfield #1] was constructed around 2012[;]" "[t]he south part [Sprayfield #2] of it was constructed maybe two years later, something like that." (Id. at 10-11). CFM Group, an engineering group with whom SEC consulted, designed the Sprayfield system #1 and sent SEC a contractor to build Sprayfield system #1; Schumacher Irrigation designed Sprayfield #2 and a different contractor built it. (Id. at 11).

In July 2014, SEC reported to ADEM that 50,000 gallons of treated wastewater "had inadvertently drained to an unknown culvert which then discharged into the UT [unnamed tributary] to Cottonwood Creek." (Doc. 95-6 at 3). SEC "did not have a permit to discharge into

the UT to Cottonwood Creek" so its "discharge into the UT to Cottonwood Creek was an unpermitted discharge…" (Id. at 4). On April 1, 2015, SEC again notified ADEM "of a possible discharge from [SEC's] sprayfields into the UT Cottonwood Creek" from what SEC "observed to be a breach in the berm surrounding the sprayfields." (Id.) SEC "did not have a permit to discharge into the UT to Cottonwood Creek" so it's "discharge into the UT to Cottonwood Creek was an unpermitted discharge…" (Id. at 5). On June 5, 2015, ADEM filed a complaint against SEC in the Circuit Court of Marengo County, Alabama pertaining to both the July 2014 and April 2015 incidents. (Doc. 95-6). Thereafter, in July 2015, ADEM and SEC entered into a consent decree detailing certain remedial measures SEC needed to implement so that it would be in compliance with ADEM regulations. (Doc. 95-17). The consent decree also set forth civil penalties that SEC paid for violations through June 2015; it also contained a per day penalties provision to be paid by SEC for future failures to comply with the consent decree. (Id.).

In December 2015, Black Warrior Riverkeeper, Inc.[4] sent Mr. Rankin, as SEC's Registered Agent, notice of alleged violations of the Clean Water Act and its intent to file suit after 60 days if the alleged violations continued. (Doc. 95-18). Black Warrior Riverkeeper, Inc. filed suit against SEC on February 25, 2016. (*Black Warrior Riverkeeper, Inc., v. Southeastern Cheese Corporation*, 2:16-cv-00083-KD-B). On January 24, 2017, the Black Warrior Riverkeeper, Inc. action was dismissed because it was barred by the diligent prosecution provision contained in the Clean Water Act. (*Black Warrior Riverkeeper, Inc., v. Southeastern Cheese Corporation*, 2:16-cv-00083-KD-B, Doc. 27). See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc., 528 U.S. 167, 174-75 (2000) (quoting 33 U.S.C. § 1365(b)(1)(B) (the Clean Water Act "bars a citizen from suing if the

---

[4] Black Riverkeeper, Inc. "is an Alabama nonprofit membership corporation with over 2,000 members that is dedicated to protecting and restoring Black Warrior River and its tributaries." (Doc. 95-20 at 10).

[Environmental Protection Agency] or State has already commenced, and is 'diligently prosecuting,' an enforcement action.").

On August 11, 2016, SEC filed a malpractice action against its engineering firm, CFM Group, alleging various claims pertaining to defects in the design of the sprayfield system. (Doc. 95-26). SEC asserts that CFM's actions caused SEC "to be in noncompliance with ADEM permits issued for the disposal of waste water effluent, exposing [SEC] to increasing fines, legal fees, engineering reports, amendments to nutrient management plan, multiple university studies, and consent orders;" among other asserted injuries. (Doc. 95-26 at 14-15).

SEC completed a "Site Specific Pollution Liability Application" for insurance with Defendant Rockhill Insurance Corporation (Rockhill) on February 9, 2015. (Doc. 95-12). Rockhill issued the 2015 policy on April 16, 2015 with a policy period from March 23, 2015 to March 23, 2016. (Doc. 95-15). On February 4, 2016 SEC again completed a "Site Specific Pollution Liability Application" for insurance with Rockhill. (Doc. 95-19). Rockhill issued this policy April 25, 2016 with a policy period from April 23, 2016 to April 23, 2017. (Doc. 95-22).

At issue in this case is the 2017 Policy and Application. (Doc. 95 at 12). On April 7, 2017 SEC completed a "Site Specific Pollution Liability Application" (the 2017 Application) for insurance with Rockhill. (Doc. 95-28). Rockhill issued the 2017 Policy (the Policy) on April 20, 2017 which lists a policy period from April 23, 2017 to April 23, 2018. (Doc. 95-29 at 4). Relevant portions of the 2017 Application are shown below (Doc. 95-28 at 5):

*Question 18:*

| 18. | Have you during the last five years received any violations regarding any standard or law relating to the Release of a substance from the location(s) into sewers, rivers, air or onto land? ☒ Yes ☐ No |
|---|---|
| | If yes, please provide details: _Self-reported one time wastewater spill_ |
| | If yes, have you ever been prosecuted?   ☐ Yes   ☒ No |

*Question 19:*

| 19. | Please describe any pollution claims which have occurred during the last five years, (if none, please state so): |
|---|---|
| | N/A |

*Question 20:*

| 20. | At the time of signing this application are you aware of any circumstances which may reasonably be expected to give rise to a claim under this policy?  ☐ Yes  ☒ No<br>If yes, please provide details: |
|---|---|

*Warranty Statement and Signature Block:*

**WARRANTY STATEMENT**

The undersigned authorized officer of the applicant declares that the statements set forth herein are true. The undersigned authorized officer agrees that if the information supplied on the application changes between the date of the application and the effective date of the insurance, he/she (undersigned) will immediately notify the insurer of such changes, and the insurer may withdraw or modify any outstanding quotations and/or authorization or agreement to bind the insurance. Signing of this application does not bind the applicant or the insurer to complete the insurance.

Notice to applicants: Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance containing and false information, or conceals for the purpose of misleading, information concerning fact material thereto, contains a fraudulent insurance act, which is a crime.

_____
(Signature)

President
_____
(Title)

4/10/17
_____
(Date)

Relevant sections of the Policy are shown below (Doc. 95-29 at 9, 17).

*Non-Disclosed Conditions Exclusion Provision:*

IV. EXCLUSIONS

This insurance Policy does not apply to:

A. Non-Disclosed Conditions

CLEAN-UP COSTS, CLAIMS, or LEGAL EXPENSE arising from any POLLUTION CONDITION or any other material circumstances existing prior to the inception date of this Policy, or prior to such subsequent time that a Scheduled Location is endorsed to this Policy, and not disclosed in the application for this Policy, provided that any RESPONSIBLE INSURED knew or reasonably could have expected that such POLLUTION CONDITION or material circumstances could give rise to CLEAN-UP COSTS, CLAIM or LOSS under this Policy.

Subject to all other terms, conditions, exclusions, and RETROACTIVE DATE(S), if any, of this policy, any POLLUTION CONDITION disclosed by the INSURED in writing to the Company and not otherwise excluded under this Policy or by endorsement is deemed to be first discovered on the date a SCHEDULED LOCATION is endorsed to this Policy.

## *Choice of Law Provision:*

N. Choice of Law

All matters arising hereunder including questions related to the validity, interpretation, performance, and enforcement of this Policy shall be determined in accordance with the law and practice of the State of Missouri (notwithstanding Missouri's conflicts of law rules).

After the Policy went into effect, three state civil lawsuits (Underlying State Court Suits) were filed against SEC. (Doc. 95-31, Doc. 95-32, Doc. 95-33). The first suit, *Calhoun, et al. v. Southeastern Cheese Corp., et al.* (the Calhoun suit)*,* was filed February 16, 2018. (Doc. 95-31). It generally asserts SEC's "spray field waste facilities produce" "periodic, frequent discharge, emission and/or occurrence of extremely noxious and offensive odors" that have affected plaintiffs' enjoyment of land, plaintiffs' health, and their property. (Id.). The second suit, *Jones v. Southeastern Cheese Corp., et al.* (the Jones suit)*,* was filed on April 10, 2018. (Doc. 95-32). It asserts claims against SEC such as claims for problems with SEC's sprayfield system, issues related to pooling and ponding of wastewater, and foul odors that "pervades" the area. (Id.). The last suit, *Belcher v. Southeastern Cheese Corp., et al.* (the Belcher suit), was filed July 23, 2018. (Doc. 95-33). It alleges defects in SEC's sprayfield system, resulting ponding of water because of the defects, foul smells from the wastewater, and "discharges, spills or runoff from the sprayfields into the tributaries to and/or directly into Cottonwood Creek" among other allegations." (Id. at 13). SEC sought coverage from Rockhill in defense of the Underlying State Court Suits.

Rockhill asserts that SEC knew about 1) the ADEM violations; 2) lawsuits against it 3) neighboring landowner complaints; and 4) defects in the design of its sprayfield system. (Doc. 95 at 3). But, per Rockhill, SEC failed to disclose this information on its 2017 Application. (Id.). Rockhill claims the Policy was issued in reliance on SEC's statements and representations in the 2017 application. (Doc. 95-30 at 79). "And because SEC chose not to disclose these realities, its attempt now to reap coverage benefits for liability arising out of this defective sprayfield system is foreclosed by (1) the known loss doctrine, (2) the Policy's plain Non-Disclosed Conditions exclusion, and (3) its material misrepresentations and omissions that void the policy." (Doc. 95 at 3).

## II.    Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). Defendants, as the parties seeking summary judgment, bear the initial responsibility of informing the district court of the basis for their motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). If the nonmoving party fails to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof—that a genuine dispute of material fact exists—the moving party is entitled to summary judgment. Celotex, 477 U.S. at 323. "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter…the evidence of the non-movant is to be believed, and all justifiable inferences are to be

drawn in his favor." Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998–99 (11th Cir. 1992) (internal citations and quotations omitted).

Summary judgment may nonetheless be appropriate in certain scenarios even with conflicting versions of events. The Supreme Court has instructed that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott v. Harris, 550 U.S. 372, 380 (2007). When the non-movant's assertion is "so utterly discredited" by the record, no "genuine" dispute of material fact exists sufficient to prompt an inference on behalf of the non-movant. Id. at 381.

## III.     Conclusions of Law

### A.  Choice of Law Rules for Federal Courts Sitting in Diversity

As an initial matter this Court must determine the substantive law to apply. In diversity cases, the choice-of-law rules of the forum state determine which state's substantive law applies. Klaxon Co. v. Stentor Electric Manufacturing Co., 313 U.S. 487 (1941); see American Family Life Assurance Co. Of Columbus, Ga. v. U.S. Fire Co., 885 F.2d 826, 830 (11th Cir. 1989); Grupo Televisa, S.A. v. Telemundo Communications Group, Inc., 485 F.3d 1233, 1240 (11th Cir. 2007) (same). Alabama follows the traditional *lex loci contractus* conflict of laws doctrine. American Safety Indemnity Company v. Fairfield Shopping Center, LLC, 2016 WL 3878496, *16 (N.D. Ala. 2016) (citing New Hampshire Ins. Co. v. Hill, 516 Fed. Appx. 803, 805 (11th Cir. 2013) and Smith v. State Farm Mut. Automobile Ins. Co., 952 So.2d 342, 347 (Ala. 2006)). Under this doctrine, Alabama courts generally interpret contracts, including insurance policies, according to the law of the state in which the contract was made or the state in which the policy was issued. Id. And see

New Hampshire Ins. Co., 516 Fed. Appx. at 805 (under Alabama conflict of laws rules, Florida laws were used to interpret an insurance policy that was issued in Florida).

Alabama codified a specific rule for insurance contracts when the application for insurance occurs in Alabama. See Alabama Code Section 27-14-22. Section 27-14-22 states: "All contracts of insurance, the application for which is taken within the state, shall be deemed to have been made within this state and subject to the laws thereof." Ala. Code § 27-14-22. In 1910, the Alabama Supreme Court interpreted the predecessor to Section 27-14-22[5] to be a mandatory choice of law provision that overrides contractual choice of law provisions. State Life Ins. Co. of Indianapolis v. Wescott, 52 So. 344, 345 (Ala. 1910). Later, in 1999, the Alabama Supreme Court recognized its earlier holding in Wescott but it neither relied on its earlier holding nor did it overrule it. American Bankers Ins. Co. of Florida v. Crawford, 757 So.2d 1125, 1135-36 (Ala. 1999).

More recently, in 2009, the Alabama Supreme Court stated, "Alabama law has recognized the right of parties to an agreement to choose the law of a particular state to govern the agreement." Lifestar Response of Alabama, Inc. v. Admiral Ins. Co., 17 So.3d 200, 213 n.3 (Ala. 2009). See also Ex parte Owen, 437 So.2d 476, 481 (Ala. 1983) (recognizing an exception to the general *lex loci contractus* rule when "the parties intend the law of some other place to govern [the contract], or [when the contract] is to be wholly performed in some other place."). The only exception to this appears to be if applying the contractual choice of law provision would violate Alabama public policy. Cherry, Bekaert & Holland v. Brown, 582 So.2d 502, 507 (Ala. 1991) ("While parties normally are allowed to choose another state's laws to govern an agreement, where application of that other state's laws would be contrary to Alabama policy, the parties' choice of law will not be given effect and Alabama law will govern the agreement."). Accordingly, the Court finds that

---

[5] Section 4583 of the Code of 1907 contained identical language to Section 27-14-22. See State Life Ins. Co. of Indianapolis v. Wescott, 52 So. 344, 344 (Ala. 1910).

Section 27-14-22 is a choice of law provision, but that it does not override a parties' contractual choice of law.

The Policy includes a "Choice of Law" provision which calls for application of Missouri law. (Doc. 95-29 at 17).[6] Per the Policy, Rockhill maintains Missouri law applies. (Doc. 95 at 14). SEC contends it applied for insurance in Alabama, so Alabama law applies per Section 27-14-22. (Doc. 103 at 19). As discussed *supra*, the parties' contractual choice of law in the Policy is not overridden by the choice of law provision in Section 27-14-22 unless the provision would violate Alabama public policy. Thus, Missouri law applies because the Policy's choice of law provision does not violate Alabama public policy.

### B. The Known Loss Doctrine

Rockhill asserts "the law does not allow SEC to… purchase liability coverage for a liability it already knew was unfolding…[this] violates the fortuity principle [or the "known loss doctrine"] of insurance and is foreclosed by Missouri law." (Doc. 95 at 15). SEC responds that this doctrine is not recognized under Alabama law. (Doc. 103 at 21). Further, SEC questions whether this doctrine would apply to third-party insurance contracts even under Missouri law. (Id.).

The Missouri Court of Appeals describes the known loss doctrine as:

"'a fundamental principle of insurance law [which provides] that an insurer cannot insure against a loss that is *known or apparent to the insured…*'" *Inland Waters Pollution Control v. National Union,* 997 F.2d 172, 177 (6th Cir.1993) (citation omitted); *see Bartholomew v. Appalachian Ins. Co.,* 655 F.2d 27, 28 (1st Cir.1981) (holding insureds could not recover from insurer where insureds were fully aware of loss before policy in effect). The doctrine builds upon the principle one cannot insure property that has already been destroyed. *See M.F.A. Mut. Ins. Co. v. Quinn,* 259 S.W.2d 854, 860 (Mo.App.K.C.1953). The doctrine is rooted in preventing

---

[6] The Policy's choice of law provision (Doc. 95-29 at 17):

    N.  Choice of Law

    All matters arising hereunder including questions related to the validity, interpretation, performance, and enforcement
    of this Policy shall be determined in accordance with the law and practice of the State of Missouri (notwithstanding
    Missouri's conflicts of law rules).

fraud on the part of an insured, who would obtain an insurance policy knowing he has suffered or is in imminent danger of suffering a loss, and who would fail to disclose these facts to the insurer. *See Presley v. National Flood Insurers Association,* 399 F.Supp. 1242, 1244 (E.D.Mo.1975); *United Technologies Corp. v. American Home Assur. Co.,* 989 F.Supp. 128, 151 (D.Conn.1997).[3] Moreover, several courts, including a federal court applying Missouri law, have approvingly stated, " '[W]here some quick process of destruction is under way at the moment, even insurance innocently bought and issued should not cover.' " *Presley,* 399 F.Supp. at 1244–45 (citations omitted). As stated by the Sixth Circuit after a comprehensive review of case law addressing the issue, the "loss in progress" doctrine "operates only where the insured is aware of a threat of loss so immediate that it might fairly be said that the loss was in progress and that the insured knew it at the time the policy was issued or applied for." *Inland Waters,* 997 F.2d at 178.

United Capitol Ins. Co. v. Hoodco, Inc., 974 S.W.2d 572, 574-75 (Mo. Ct. App. 1998). In United Capitol Ins. Co., Hoodco repeatedly attempted to secure insurance protection in the event of a flood but "remained silent about the peril immediately facing the Hoodco property." Id. at 575. The levee protecting Hoodco's store broke "one day before the effective date of the policy" and the court held "once the levee broke the loss was in progress so as to preclude coverage, although the damage did not manifest itself until two days later." Id. at 576 (citing Summers v. Harris, 573 F.2d 869, 871-72 (5th Cir. 1978). The court explained further:

> …in light of the knowledge component of the 'loss in progress' doctrine, the flood was in progress even before the levee broke when Hoodco admitted it knew the property would flood at least three or four days before it happened, and Hoodco was actively engaged in efforts to diminish its losses by holding a sale and removing merchandise from its West Alton warehouse.

Id. Similarly, "[i]n Presley, the district court found flood damage suffered by the insured was not covered where the insured applied for and received the insurance policy after flood waters had already entered his home and receded several times, though the greatest damage occurred within the policy period" Id. (internal citations omitted) (citing Presley, 399 F.Supp. at 1245).

Specifically, Rockhill claims SEC should be precluded from seeking coverage for the Underlying State Court Suits because, before SEC applied for pollution liability coverage, SEC

knew it had 1) defects in its sprayfield systems; 2) prior regulatory violations; and 3) prior suits against it. (Doc. 95 at 15). Rockhill asserts that "SEC also knew that its sprayfield system had not been repaired—meaning the risk of additional lawsuits arising out of the sprayfields was ongoing." (Doc. 97 at 17).

Rockhill cites to Rankin's deposition testimony to support its contention that SEC knew its sprayfield system had not been repaired. (Doc. 97 at 17). Rankin testified that SEC brought suit against CFM for damages resulting from alleged design defects in the sprayfield system CFM designed. (Doc. 97-1 at 43-44). But, this does not indicate that SEC knew, when it applied for the 2017 policy, that it was in imminent danger of damages relating to defects in its sprayfield system. Rankin testified that at the time SEC filed its lawsuit against CFM, it knew the sprayfield system did not "effectively manage, handle, and disburse and dispose of wastewater in a way that would be in total compliance with ADEM's guidelines." (Id. at 43). Rankin was asked if as a result of the system issues, SEC's "use of that sprayfield to dispose of wastewater from its cheese plant does, in fact, and has, in fact, endangered, polluted or -- and harmed adjacent properties and streams; right?" (Id.). Rankin answered "No." (Id.). Rankin explained that "the way [CFM] had it [the sprayfield] operating, it would endanger or harm adjacent property. But what I'm saying is we've – we've added to it and we have modified what we had, and it's—it's a whole lot bigger than what they recommended, but we're getting it done with what we've got." (Id.).

Moreover, in April 2017, Rankin testified that SEC was "very, very encouraged by our situation when we filled out this application." (Id. at 64). Rankin said the Riverkeeper lawsuit was "over with—with prejudice;" "it was thrown out." (Id.). Rankin acknowledged that when SEC submitted the 2017 Application, the ADEM litigation was still pending. (Id.). Rankin explained his understanding of the ADEM litigation at that time as follows:

I believe that at that time we had Auburn—Auburn was doing a study on spray fields; ADEM was giving us more or less however much time we needed to do that, whatever Auburn said they needed to do it. We had nothing—we had no—they were giving us time to come up and do this study and come up with an amended Nutrient Management Plan and everything was in good shape.

(Id.). Rankin testified the status of Auburn's study as:

They were very, very encouraging in that they were confident that they could figure out how to make the land percolate and take up the processed water, They also told us that—to—to stop the smell, they put—put this out fresh, that it would degrade quicker and not cause any problems in the community that way.

(Id.).

Further, Question 20 on the 2017 Application asked whether there were circumstances at the time of signing the application that "may reasonably be expected to give rise to a claim under this policy." (Doc. 95-28 at 5). Rankin answered "No" to Question 20. (Id.). At his deposition, he testified that he believed his answer to be "a true and accurate, complete answer" as of the date the 2017 Application was signed. (Doc. 97-1 at 56). Further, the first of the Underlying State Court Suits was filed February 16, 2018—nearly a year after Rankin completed the 2017 Application.

Rockhill alleges the Underlying State Court Suits "flow directly from a 'known loss'" because SEC knew its sprayfield system was defectively designed. This causal link is more attenuated than in both Presley and United Capitol Ins. Co. where the "known loss" incidents occurred within days and/or during the same time the insured sought coverage. The Court finds that there are issues of material fact precluding summary judgment for Rockhill. At the least, there is a jury issue as to whether SEC knew the Underlying State Court Suits were imminent when it completed the 2017 Application.

## C. Non-Disclosed Condition Precludes Coverage

In its motion for summary judgement, Rockhill asserts: "[t]he Non-Disclosed Condition Exclusion [in the Policy] is based on the same principles underlying the common law known loss

doctrine. It excludes from coverage lawsuits arising from circumstances that the insured reasonable could expect could give rise to a lawsuit or other loss[]" which include the Underlying State Court Suits here. (Doc. 95 at 17). The Policy includes an "Exclusions" section that lists areas the "insurance Policy does not apply to." (Doc. 95-29 at 9). The relevant exclusion under the Policy is the "Non-Disclosed Conditions" subsection. It states:

A. Non-Disclosed Conditions

CLEAN-UP COSTS, CLAIMS, or LEGAL EXPENSE arising from any POLLUTION CONDITION or any other material circumstances existing prior to the inception date of this Policy, or prior to such subsequent time that a Scheduled Location is endorsed to this Policy, and not disclosed in the application for the Policy, provided that any RESPONSIBLE INSURED knew or reasonably could have expected that such POLLUTION CONDITION or material circumstances could give rise to CLEAN-UP COSTS, CLAIM or LOSS under this Policy."

(Doc. 95-29 at 9, § IV.A).

Per Rockhill, the Policy:

exclusion forecloses coverage for: (1) lawsuits[7] (*see* [Doc. 95-29 at 7] § II.D); (2) arising from any 'discharge, dispersal, release, seepage, migration, or escape of POLLUTANTS[8] into or upon the land…the atmosphere, or any watercourse or body of water…' (*see* [Doc. 95-29 at 8] § II.O), or any other material circumstances existing prior to the inception date of this policy, which; (3) were not disclosed in the application; (4) provided that any officer, director or partner of the insured (*see* [Doc. 95-29 at 8] § II.Q); (5) knew or reasonable could have expected that these

---

[7] Rockhill cites to the definition of "CLAIM" in the policy. (Doc. 95-29 at 7). Per the policy, a "CLAIM means a written demand(s), notice(s) or assertion(s) of a legal right alleging liability or responsibility on the part of the INSURED seeking a remedy and shall include but not be limited to lawsuit(s), petition(s), order(s), or government and/or regulatory actions, filed against the INSURED by a third party." (Id.).

[8] (Doc. 95 at 18, n. 2 (citing Doc. 95-29 at 8) ("Pollutants are defined as "any solid, liquid, gaseous or thermal pollutant, irritant or contaminant including but not limited to smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, hazardous substances, waste materials, including medical, infectious and pathological wastes, and electromagnetic fields provided that such POLLUTANTS are not naturally present in the environment in the amounts or concentrations discovered." (Ex. 29, Policy at § II.N). The whey byproduct dispersed in SEC's sprayfields satisfies this definition. Were SEC to challenge this reality it would have no coverage under the pollution liability policy in the first instance.)).

undisclosed conditions or circumstances could give rise to: CLEAN UP COSTS,[9] lawsuits, demands, or LOSS.[10]

(Doc. 95 at 18).

SEC does not respond to Rockhill's contention that the elements for exclusion under the Policy are met. Instead, SEC responds that its answers to the Policy application "disclosures, or to use Rockhill's words, 'red flags,'… would have put a reasonable insurer on notice but into which Rockhill failed to inquire further." (Doc. 103 at 30). Per SEC, because Rockhill failed to inquire further, Rockhill cannot avoid the Policy even if the information SEC disclosed was insufficient. (Id. at 31).[11]

### 1. Elements for Exclusion Under the Policy

According to Rockhill, the Underlying State Court Suits are excluded under the Policy because:

> The Underlying State Court Suits are (1) lawsuits; (2) that arise from POLLUTION CONDITIONS and material circumstances; (3) which were not disclosed to Rockhill; (4) SEC's president knew about these conditions and circumstances; and (5) a reasonable person in his position could have expected that these conditions and circumstances could give rise to a lawsuit and/or expenses to correct and remove the POLLUTION CONDITION.

(Doc. 95 at 18).

---

[9] (Doc. 95 at 18, n. 3 (citing Doc. 95-29 at 7) ("CLEAN UP COSTS means "necessary and reasonable expenses incurred as a result of POLLUTION CONDITION to investigate, assess, remove, dispose of, abate, contain, treat, immobilize or neutralize a POLLUTION CONDITION, to the extent required by: 1. Federal, State, Local or Provincial Laws, Regulations or Statutes . . ." (see id. at § II.E).")).

[10] (Doc. 95 at 18, n. 4 (citing Doc. 95-29 at 7) ("LOSS means "monetary judgment, award or settlement of compensatory damages arising out of BODILY INJURY or PROPERTY DAMAGE as a direct result of a POLLUTION CONDITION, as well as related punitive, exemplary or multiplied damages where insurance coverage is allowable by law. (see id. at § II.J)")).

[11] See discussion *infra* regarding allegations that Rockhill had a duty to inquire further.

The Underlying State Court Suits satisfy the first requirement of the exclusion provision—the suits fall within "CLEAN-UP COSTS, CLAIMS, or LEGAL EXPENSE." Per the Policy, "CLAIM means a written demand(s), notice(s) or assertion(s) of a legal right alleging liability or responsibility on the part of the INSURED seeking a remedy and shall include …lawsuit(s)…" (Doc. 95-29 at 7). These "civil lawsuits… filed against SEC" therefore satisfy "Claim" as defined by the Policy. (Id. at 13). But, the Policy also requires the Underlying State Court Suits arise from an undisclosed "POLLUTION CONDITION or any other material circumstances" "that any REASONABLE INSURED knew or reasonably could have expected" to give rise to "COSTS, CLAIMS, or LOSS under this Policy." (Doc. 95-29 at 9).

The standard here differs slightly from the reasonable expectation under the known loss doctrine. According to Rockhill, Missouri law interprets this element to be what a reasonable person in the insured's position would expect—it does not add a subjective element to see if SEC specifically acted reasonably. (Doc. 95 at 23). See e.g., First Bancshares, Inc. v. St. Paul Mercury Ins. Co., 2011 WL 4352551, *3 (W.D. Mo. 2011) (citing Wittner, Poger, Rosenblum & Spewak v. Bar Plan Mut. Ins. Co., 969 S.W.2d 749, 754 (Mo. 1998) (determining that a contract provision providing coverage for acts occurring before the policy period as long as the "Insured had no basis to believe that the Insured" had committed an act giving rise to liability was "not the subjective belief of the insured" but rather derived from the language in the policy).

Even still, Rockhill maintains that "SEC did, in fact, expect that CLEAN-UP COSTs and CLAIMs could result from its defective sprayfields." (Id.). Rockhill alleges:

> SEC's lawsuit against its own engineering firm—filed prior to the Policy application—identified the following consequences flowing from its defective sprayfields:[5] noncompliance with ADEM permits, exposing SEC to increasing fines, legal fees and consent orders; exposure to additional lawsuits by environmental groups; a requirement that SEC will need to expend millions of

dollars to redesign and/or relocate the plant and its waste water disposal system. (Ex. 26 at ¶ 44).

***

> Footnote 5: These allegations in SEC's complaint have been confirmed as sworn testimony in that SEC offered these allegations as its verified, written interrogatory responses in its CFM lawsuit. (Ex. 27 at p. 14).

(Id.).

Per Rockhill, Rankin's deposition confirms SEC anticipated "additional, future fines and lawsuits as a result of its defective sprayfield system" and "the underlying lawsuits at issue in this case….are…the types of additional lawsuits contemplated by SEC in the CFM complaint." (Id. at 24, 10). Thus, according to Rockhill, Rankin's testimony and SEC's lawsuit against CFM show that SEC knew "its defective sprayfield system could give rise to lawsuits and other liability risks…." (Id. at 24). But, Rockhill alleges, "SEC did not disclose the lawsuits, complaints from neighbors, and multiple unpermitted discharges flowing from the defective sprayfield design." (Id. at 25).

SEC responds that "there was no reason for SEC to expect a claim against it for which it would be seeking coverage under the Rockhill policy" and Rockhill mischaracterizes what SEC contemplated when it completed the 2017 Application. First, SEC asserts Rockhill mischaracterizes Rankin's testimony about which "additional lawsuits" SEC contemplated when it filed its suit against CFM. (Doc. 103 at 6). According to SEC, Rockhill's motion erroneously implies that SEC contemplated the Underlying State Court Suits when it filed its complaint against CFM. (Id.; compare with Doc. 97 at 10). The deposition examination occurred as follows:

> Q by Rockhill Counsel: Okay. And in the same way, if you look up at the next page [Doc. 95-3 at 15], Mr. Rankin, where you have paragraph C, do you see where it says that 'The defendants here, CFM, have exposed plaintiff to additional lawsuits'? Do you see that?

A by Rankin: Uh-huh.

Q: And it's possible—so, so far we've talked about the Riverkeeper lawsuit against Southeastern Cheese; right?

A: Right.

Q: And we know we have the Calhoun and the Smith and the Belcher lawsuit against Southeastern Cheese?

A: Right.

Q: And so those are some of the lawsuits that have resulted from the exposure that CFM has created; right?

A: Right.

(Doc. 97-1 at 44).

Rockhill counsel asked Rankin at this deposition about a paragraph in the SEC v. CFM complaint which states: "[CFM] has exposed the Plaintiff [SEC] to additional lawsuits by environmental groups for the contamination of surrounding properties and streams[.]" (Doc. 95-3 at 15). Rankin's testimony is not that the Underlying State Court Suits were anticipated or expected when SEC completed the 2017 Application. Rankin only agreed that the Underlying State Court Suits are suits "that have resulted from the exposure that CFM has created." (Doc. 97-1 at 44).

Moreover, as this Court previously noted, the 2017 Application did not "specifically ask SEC to disclose a 'pollution condition or any other material circumstances.'" (Doc. 64 at 9). SEC asserts that questions that were asked on the 2017 Application were ambiguous and "there is a genuine dispute of fact as to whether SEC's responses… include any…omission." (Doc. 103 at 25, 26). As discussed *supra*, Rankin believed his answer to Question 20 on the 2017 Application —which asked whether he expected future claims on the Policy— was complete, "true and accurate when we answered it." (Doc. 97-1 at 64, 56).

SEC also asserts "information provided by Rockhill's authorized agent, [Environmental Underwriting Solutions] EUS" led SEC to believe ADEM actions and the Riverkeeper matter "did not give rise to a claim under the policy within the meaning of Question 20" on the 2017 Application. (Doc. 104 at 12; citing Doc. 97-3 at 2 (responding Rockhill's policy excludes fines and smell complaints unless there have been "BI or PD to the claimant.")). See also (Doc. 97-1 at 54). Based on this belief, SEC contends it did not seek nor did it expect either the Riverkeeper suit or the ADEM regulatory proceedings to be covered by the Policy. (Doc. 104 at 13; Doc. 103 at 13). SEC claims it's answer to question 20 on the 2017 Application was informed by this belief. (Id.).[12]

As discussed *supra* and equally applicable here, there is a genuine issue of material fact only a jury can resolve as to whether SEC reasonably expected claims under the Policy when it completed the 2017 Application. See (Doc. 95-28 at 5; Doc. 95-29 at 9).

**D. Misrepresentations in Insurance Application**

"The law in Missouri is that a material misrepresentation in an application for insurance is a valid ground for avoiding the policy, *even though the misrepresentation is innocently or inadvertently made.*" Delisle v. Cape Mutual Insurance Co., 675 S.W.2d 97, 100 (Mo. App. 1984) (quoting American Fire and Indemnity Co. v. Lancaster, 415 F.2d 1145, 1146 (8th Cir. 1969) (emphasis added)). It is not enough that a party made a misrepresentation—the misrepresentation must be false and material. Northland Insurance Companies v. Fantasy Bus Service Inc., 1996 WL

---

[12] SEC also maintains that the 2017 Application did not ask for SEC to disclose defects or issues with its sprayfield, equipment or operations. (Doc. 103 at 25). Moreover, per SEC, "design defects in the sprayfield irrigation system is not a POLLUTION CONDITION or a material fact for which disclosure was requested in the application submitted by SEC." (Id.). A defect in the design of the sprayfield system does not satisfy a POLLUTION CONDITION as defined by the Policy. As to whether this alleged defect constitutes a "material circumstances", a genuine issue of fact exists about what constitutes "material" under the Policy.

115515, *4 (E.D. Mo. 1996); West v. Wilton Reassurance Life Co. of New York, 601 F.Supp.2d 1133, 1137) ("Wilton need only prove Mr. West's answer to Question 4 was false and material, not that there was an intent to deceive."); Hite v. American Family Mut. Ins. Co., 815 S.W.2d 19, 22 (Mo. App. 1991) (where application for insurance was incorporated into the policy, the insurer "must prove only that the representations…on the application for insurance were false and material, not that the misrepresentations were fraudulently made.").[13]

"In determining materiality, the inquiry is not whether the misrepresentation actually affected the insurer's decision, but whether 'it would have influenced a reasonably careful insurance company's decisions concerning the acceptance of risk and what premium to charge[.]'" Smith ex rel. Stephan v. AF & L Ins. Co., 147 S.W.3d 767, 774 (Mo. Ct. App. 2004) (quoting *Adams v. Columbia Mut. Ins. Co.,* 978 S.W.2d 10, 11 (Mo.App.1998); Ins. Corp. of Hannover v. Vantage Prop. Mgmt., L.L.C., 2006 WL 2385138, *6 (W.D. Mo. 2006) ("[I]t must be determined whether truthful answers by the insured would have caused 'those engaged in the insurance business' to reject the risk or charge higher premiums."); Continental Casualty v. Maxwell, 799 S.W.2d 882, 889 (Mo. App. 1990) (A misrepresentation is deemed material where it is reasonably calculated to affect the action and conduct of the company in deciding whether to accept the risk by issuing its policy covering the risk); Miller v. Plains Insurance Co., 409 S.W.2d 770, 774 (Mo. App. 1966) (In an application for an automobile insurance policy, "[a] misrepresentation that would likely affect the conduct of a reasonable man in respect to his transaction with another is material"). "[T]he question of materiality is generally a question of fact for the jury." Continental Cas. Co., 799 S.W.2d at 889 (materiality is a jury question unless "all minds would agree it is or

---

[13] Here, the Policy "is issued in reliance upon the truth of those representations" in the Application. (Doc. 95-29 at 16).

is not material"). And see CitiMortgage, Inc. v. OCM Bancorp, Inc., 2011 WL 1594950, *6 (E.D. Mo. 2011) (same)

Rockhill contends it would not have issued the Policy had SEC made more accurate disclosures and statements. (Doc. 95-30 at 79). There is contradictory evidence as to whether SEC's answers on the 2017 Application would have prompted further inquiry by insurance companies generally and if it would have "influenced reasonably careful insurance compan[ies]" to inquire further. Adams v. Columbia Mut. Ins. Co., 978 S.W.2d 10, 11 (1998).  As an example, compare Rockhill representative's testimony ("I don't know that [SEC's answer to question 18 on the 2017 Application] would be a red flag for her [Rockhill's underwriter]." (Doc. 95-30 at 69-70)) with SEC's expert witness (a prudent and reasonable underwriter would want more information about SEC's answer to question 18 (Doc. 103-2 at 24)). It is also disputed whether Rockhill "'act[ed] reasonably and in accord with [its own] custom and practice, [when it] relied on the representation'" in the 2017 Application. Northwestern Mut. Life Ins. Co. v. Gallinger, 2008 WL 4965876, *3 (E.D. Mo. 2008); (Doc. 95-30 at 40) (underwriters have latitude but the guidelines were to be followed).  See, Doc. 95-30 at 27 ("I think if there was a red flag, [Rockhill] would expect [the underwriters] to do so [to follow up], yes."). Thus, there are jury questions that preclude summary judgment.

**IV.**     **Conclusion**

For the reasons discussed herein, Rockhill's Motion for Summary Judgment (Doc. 94) is **DENIED** on all claims.

**DONE** and **ORDERED** this the **7th day** of **April 2020**.

/s/ Kristi K. DuBose
**KRISTI K. DuBOSE**
**CHIEF UNITED STATES DISTRICT JUDGE**